419 S.E.2d 683

STATE of West Virginia, Plaintiff Below, Appellee,

v.

William A. STEWART, Defendant Below, Appellant.

No. 20506.

Supreme Court of Appeals of West Virginia.

Submitted April 7, 1992.

Decided May 28, 1992.

Silas B. Taylor, Sr. Deputy Atty. Gen., Charleston, for appellee.

Thomas W. Smith, Charleston, for appellant.

PER CURIAM:

The appellant, William A. Stewart, appeals from the August 3, 1990, final order of the Circuit Court of Kanawha County which sentenced the defendant to serve a term of imprisonment of life without hope of parole for the first-degree murder of his wife, Nancy Stewart, and a consecutive term of one-to-five years for the attempted first-degree murder of his stepdaughter, Melissa Armstrong.

The appellant, William Stewart, the defendant below, lived with his wife, Nancy, and their two children, Jasmine and Robert Stewart. Also living with William and Nancy Stewart was Melissa Armstrong, one of Nancy Stewart's daughters. A second daughter, Melanie Armstrong, lived with her grandmother. By all accounts, the appellant was an alcoholic and also took narcotics and antidepressant medications.

Testimony elicited at trial indicated that on January 28, 1989, the appellant made hostile remarks toward his wife and her two children. Melanie Armstrong, the daughter who lived with her grandmother, testified that the defendant was arguing and complaining to his wife about her not being home while she was going to school and that "if I go down, I'll take you three with me." Later that same day, the defendant told his neighbor, Michael Facemire, that he wished his wife would leave and not come back. That same afternoon, he showed Mr. Facemire a new loaded .44 caliber gun which he had recently purchased. The evening prior to the shooting, the defendant visited Frankie Billo's bar and displayed the gun to several patrons, making remarks such as "someone is going to die tonight", "I'm going to end up using this on somebody tonight", and "fireworks

are going to start tonight." The gun was removed from Mr. Stewart's possession and Mr. Stewart was ejected from the bar. Unfortunately, however, someone returned his gun to him after he was ejected.

Upon returning home, the appellant began arguing with Nancy Stewart. According to Nancy Stewart's daughter, Melissa, she was awakened at 3:00 a.m. by the argument. Shortly thereafter, as the defendant was passing by her bedroom, he shot at her while she lay in her bed and missed her head by five or six inches. Melissa stated that the defendant chased her mother outside, at which time two or three shots were fired. The defendant returned to the trailer, where he told his two children, Jasmine and Robbie, to stay in bed, that it would "be alright." He then returned outside, whereupon Melissa heard one more shot.

The Stewarts' next door neighbors, Michael Facemire and his wife, Joyce, testified that he and his wife woke up at 3:00 a.m. the morning of the shooting, but prior to the actual shots being fired, because their infant daughter had awakened. As his wife returned from the kitchen with a bottle, Mr. Facemire testified that they heard a single shot and then several seconds later a string of two or three shots, and then a final shot "a little bit later." He also testified that he heard a lot of screams. After the shots stopped, Nancy's mother telephoned, stating that Melissa had called her and said that Bill had shot Nancy, and asked if he had heard any shots. He answered yes. She stated that she had already called the police and that they were on their way. Mr. Facemire testified that there was excellent lighting between the two trailers and that once the police arrived, he saw Nancy Stewart's body being photographed by the police. He also testified that his trailer now had two bullet holes, with one bullet lodged beneath his refrigerator.

The police discovered the appellant lying a few feet away from the body of Nancy Stewart, with the gun placed close to her body. Nancy Stewart was declared dead at the scene. A trail of blood led from her body to the spot where the appellant was located. He had a gunshot wound in the face. A blood alcohol level performed on the appellant two hours after the shooting was .274.

At trial, the defendant testified that when he came home from the bar that night, he argued with his wife, locked his gun up, and remembered nothing more until he woke up in the hospital the next morning. There was additional testimony that, while in the hospital, the defendant told hospital personnel that his wife had shot him and then herself. This theory was not seriously pursued because the autopsy showed that Nancy Stewart was shot in the back.

Also testifying was Dr. Johnny Gallemore, Chief of Psychiatry at the Huntington Veteran's Hospital. Dr. Gallemore testified that the appellant's .274 blood alcohol level was inconsistent with the ability to form an intent to kill. Dr. Nancy Graham, a resident psychiatrist at Charleston Area Medical Center, testified that she treated the appellant while he was in the hospital following the injury to his face. Although he was unable to talk, he would write her notes on a pad of paper. She stated that the appellant told her that he thought his wife had shot him, although he could not really remember. She also testified that people who drank regularly and heavily could develop a tolerance to the alcohol, but that the effect could vary widely. Upon questioning by Mr. Taylor, Dr. Graham stated that she had written to Mr. Taylor and told him that she felt that Mr. Stewart would be best served by obtaining a forensic evaluation by a physician trained in courtroom situations. She suggested Dr. Gallemore, who was eventually retained.

The next expert to testify was Dr. Ralph Smith, who testified that he was a board certified forensic psychiatrist, which he defined as "the application of law in the field of psychiatry. Working with Worker's Compensation cases, Social Security claimants, child custody problems, civil and criminal cases in court." He also stated that he was the only board certified forensic psy-

chiatrist in the State and one of only 220 across the country. Essentially, Dr. Smith testified that chronic alcoholics could develop a tolerance for high levels of alcohol in their bloodstream, meaning that they could function relatively normally at the high level. He concluded that, despite the appellant's blood alcohol level, his behavior at the time of the shooting was indicative that he was rationale and capable of deliberate thought.

On July 23, 1990, the jury found the defendant guilty of first-degree murder with no recommendation of mercy and guilty of the attempted murder of his stepdaughter, Melissa Armstrong. The court sentenced the appellant to life without possibility of parole for the first-degree murder conviction and a consecutive term of one-to-five years for the attempted murder conviction. It is from this final ruling that the appellant now appeals.

The appellant states several errors which he contends constitute reversible error. The appellant's major argument is that inflammatory statements made by the prosecutors during the trial had the cumulative effect of denying his right to a trial by an impartial jury. He points to several comments made by the prosecutor during opening and closing statements as the basis for his argument. The State counters that the errors alleged by the appellant were not improper, and even if improper, the statements were harmless and did not contribute to the guilty verdict. *See Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). We agree that the appellant's assignments of error were either proper statements or harmless error.

■ The general rule regarding the function of a prosecuting attorney in a criminal case has been set forth by this Court in *State v. Boyd,* 160 W.Va. 234, 233 S.E.2d 710 (1977). In *Boyd,* we held that:

The prosecuting attorney occupies a quasi-judicial position in the trial of a criminal case. In keeping with this position, he is required to avoid the role of a partisan, eager to convict, and must deal fairly with the accused as well as the other participants in the trial. It is the prosecutor's duty to set a tone of fairness and impartiality, and while he may and should vigorously pursue the State's case, in so doing he must not abandon the quasi-judicial role with which he is cloaked under the law.

*Id.* at syl. pt. 3. *See also State v. Moss,* 180 W.Va. 363, 376 S.E.2d 569 (1988). In *State v. Dunn,* 162 W.Va. 63, 246 S.E.2d 245 (1978), this Court ruled that improper remarks are not reversible error unless, when considering the whole trial, the statements work "a manifest injustice" or "clearly prejudice the accused." *Id.* at syl. pt. 1. *See also, State v. Hobbs,* 178 W.Va. 128, 358 S.E.2d 212 (1987).

The appellant's primary allegation is that at trial, the State classified Dr. Smith as the "most qualified person" in the State in the area of intoxication without specific qualification. This classification would be relevant to the jury's deliberations since the defense was based upon the premise the appellant was too drunk to intend to kill either Nancy Stewart or Melissa Armstrong. During the trial Dr. Smith testified that he was a "forensic psychiatrist," which is defined as "the application of law in the field of psychiatry," that he was the only board certified forensic psychiatrist in the State of West Virginia, and that there were only 220 similarly board-certified forensic psychiatrists across the nation. He also listed board certifications in psychiatry and neurology, psychiatry, child psychiatry, and medical management.

■ *Black's Law Dictionary* defines "forensic medicine" as the application of medicine to law:

That science which teaches the application of every branch of medical knowledge to the purposes of the law; hence its limits are, on the one hand, the requirements of the law, and, on the other, the whole range of medicine. Anatomy, physiology, medicine, surgery, chemistry, physics, and botany lend their aid as necessity arises; and in some cases all these branches of science are required to enable a court of law to arrive at a proper conclusion on a contested question affecting life or property.

Based upon that definition of "forensic medicine," it is clear that Dr. Smith was qualified to testify on the issue of intoxication levels, as that question obviously includes several of the areas of expertise identified as part of forensic medicine— anatomy, physiology, and chemistry in relation to legal principles in criminal cases. Further, considering that Dr. Smith was the only board-certified forensic psychiatrist in the State, the characterization as the "most qualified person" in the State was within the realm of testimony elicited at trial.[1]

■ The defense also complains about the State's description of the grand jury process during opening statement:

Every felony case that comes before a petit jury like you comes through the indictment process. In other words, the case has to get through the grand jury before it gets to you.

A grand jury consists of 16 people, citizens like yourself, selected like yourself, who review all of the various cases and crimes that have been committed in Kanawha County over a certain period of time. And those that they allow to pass through, they return an indictment if they feel there is sufficient evidence.

The defense, however, fails to account for the remainder of the prosecution's statement to the jury:

Now, in all fairness, the indictment itself is not evidence. It is merely a formal charge that sets forth elements of the crime. (Tr. 169–170.)

The jury was correctly advised that a grand jury indictment is not evidence of guilt. No evidence was presented which persuades this Court that the statement mislead the jury into believing the grand jury proceeding was evidence of guilt against the accused.

■ The defense also lists multiple examples of the State's failure to qualify statements regarding the defendant's guilt and statements which allegedly prejudiced the appellant in front of the jury. The appellant points to the prosecutor's statements during closing argument: "He is guilty beyond a reasonable doubt of murder in the first degree, you have to decide whether to give him mercy." While a prosecutor is prohibited from interjecting his personal opinion regarding the guilt or innocence of the accused in the trial of a case, this statement was not expressed as an opinion. *State v. Kanney,* 169 W.Va. 764, 289 S.E.2d 485 (1982). Further, although we recognize that the State should have qualified the statement with an appropriate phrase such as "the evidence will show," the facts surrounding this case make the error harmless. However, we caution the prosecutors that such statements may not always be considered harmless and may, with the right set of facts, constitute reversible error.

■ The appellant next complains about the State's closing statement, where the prosecutor, in asking for life without mercy, said "Please do not ask (Melissa) to live the rest of her life at the discretion of the parole board, worrying that he may get out someday." The defense points to the State's opening statement, wherein the prosecutor said that on January 18, 1989, Mr. Stewart "made up his mind to murder his wife and stepdaughters." While we agree these statements might be prejudicial if not based in fact, sufficient evidence existed to provide a factual basis for the theory that the appellant intended to kill his wife and stepdaughters. At trial, testimony was presented wherein the accused stated that he would take his wife and stepdaughters "down" with him if he went down. Thus, we cannot say the accused was prejudiced or that the statements worked a "manifest injustice." Perhaps the "manifest injustice" standard

---

1. In *Ventura v. Winegardner,* 178 W.Va. 82, 357 S.E.2d 764 (1987), the qualification of experts was determined to be within the discretion of the trial court if the witness had specialized knowledge that would assist the trier of fact. In this case, no objection was made to Dr. Smith's qualification as an expert. Even if the defense attorney had objected, Rule 702 of the West Virginia Rules of Evidence permits liberal qualification of a witness as an expert, and the trial judge would have been well within his discretion to qualify Dr. Smith over the appellant's objection.

**428**

might be met where the evidence was less convincing. In this case, however, the evidence and testimony were more than sufficient to persuade the jury of the defendant's intentions and guilt.

The State asserts that even if the prosecutor's statements were improper, no objections were made at trial. " 'Error in the admission of testimony to which no objection was made will not be considered by this Court on appeal or writ of error, but will be treated as waived.' Syl. Pt. 4, *State v. Michael,* 141 W.Va. 1, 87 S.E.2d 595 (1955)." Syl. pt. 7, *State v. Davis,* 176 W.Va. 454, 345 S.E.2d 549 (1986). Further, the State argues that the errors do not rise to the level which would permit recognition under the plain error doctrine. In *State v. Starr,* 158 W.Va. 905, 216 S.E.2d 242 (1975), this Court ruled that a court will recognize errors not objected to below if the error involves a fundamental right of the accused which is protected by the Constitution. *Id.* at syl. pt. 4. We agree with the State that the failure of the trial attorney to object to some of the prosecutor's statements cannot be recognized under the plain error doctrine. We also believe that the failure of trial counsel to object to the prosecutor's statements does not rise to the level of ineffective assistance of counsel.

Claims of ineffective assistance of counsel are not to be made lightly. *Tucker v. Holland,* 174 W.Va. 409, 327 S.E.2d 388 (1985). Like the United States Supreme Court, we have ruled that "a defendant who asserts a claim of ineffective assistance of counsel must prove (1) that his legal representation was inadequate, and (2) that such inadequacy prejudiced his case." *Marano v. Holland,* 179 W.Va. 156, 366 S.E.2d 117, 133 (1988). *See also, Strickland v. Washington,* 466 U.S. 668, 692, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984). In syllabus points 19 and 21 of *State v. Thomas,* 157 W.Va. 640, 203 S.E.2d 445 (1974), we established the following standards for determining ineffective assistance of counsel:

In the determination of a claim that an accused was prejudiced by ineffective assistance of counsel violative of Article III, Section 14 of the West Virginia Constitution and the Sixth Amendment to the United States Constitution, courts should measure and compare the questioned counsel's performance by whether he exhibited the normal and customary degree of skill possessed by attorneys who are reasonably knowledgeable of criminal law, except that proved counsel error which does not affect the outcome of the case, will be regarded as harmless error.

\* \* \* \* \* \*

Where a counsel's performance, attacked as ineffective, arises from occurrences involving strategy, tactics and arguable courses of action, his conduct will be deemed effectively assistive of his client's interests, unless no reasonably qualified defense attorney would have so acted in the defense of an accused.

In the case now before us, the errors alleged by the appellant could be reasonably classified as tactics or arguable courses of action. Trial counsel's use of Dr. Graham's testimony can be classified as trial tactics, particularly in light of the letter read to the jury recommending Dr. Gallemore as a better qualified expert. We note that during the trial, the trial counsel objected with some frequency to statements made by the prosecutors, obtained statements from witnesses, made discovery requests, filed several motions in limine, and presented expert testimony on the issue of intoxication. Given the basis in fact for the prosecution's alleged misstatements, we cannot say that no reasonably qualified defense attorney would have so acted in representing an accused. Therefore, we find no reversible error.

Accordingly, we affirm the decision of the Circuit Court of Kanawha County.

Affirmed.