461 S.E.2d 504

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Kanju OSAKALUMI, Defendant Below, Appellant.**

No. 22614.

Supreme Court of Appeals of West Virginia.

Submitted May 16, 1995.

Decided July 19, 1995.

Darrell V. McGraw, Jr., Attorney General, Katherine Rafter, Assistant Attorney General, Charleston, for appellee.

David C. Smith, Johnston, Holroyd & Associates, Harold B. Wolfe, III, Akers & Wolfe, Princeton, for appellant.

McHUGH, Chief Justice:

This is an appeal from appellant Kanju Osakalumi's January 21, 1994 conviction, by a jury, of first-degree murder. Appellant was sentenced by the Circuit Court of Mercer County, West Virginia to life imprisonment with the possibility of parole. This Court has before it the petition for appeal, all matters of record and the briefs and argument of counsel. For the reasons stated below, the appellant's conviction is reversed and this case is remanded for a new trial.

## I.

On or about June 13, 1991, appellant and several other residents of New York City travelled to the home of Allison Charlton in Bluefield, West Virginia, bringing with them an assortment of drugs and firearms. On the afternoon of June 14, 1991, one of the persons from New York City, sixteen-year old Chandel Fleetwood, died from a single gunshot wound to the head.[1]

Appellant maintains that the victim was under the influence of marihuana when he loaded one round of ammunition into a .357 magnum revolver, spun the cylinder, put it to his own head and shot himself. Appellant and the others who were present took the body to a wooded area approximately one mile away. They also disposed of the victim's revolver and a bloodied cushion from the couch on which the victim was sitting. The following day, appellant and his friends returned to New York City.

Subsequently, officers from the Bluefield Police Department began hearing rumors that someone had been shot at the Charlton home. In January of 1992, approximately seven months after Chandel Fleetwood's death, Detectives Wilson and Miller visited the Charlton home. Upon observing the bloodied couch,[2] the detectives took samples from it as well as from the carpet surrounding it. However, they left the home without seizing the couch.

Approximately two months later, in March of 1992, police officers returned to the Charlton home, where they had left the bloodied couch, and, upon further inspection of the couch, discovered a bullet hole in it. Through a tear in a couch cushion, Detective Ted Jones inserted a writing pen into the bullet hole to determine the trajectory of the bullet.[3] He extracted a badly deformed bullet as well as some hair and bone fragments. Once again, the officers left without seizing the couch. However, they returned to the Charlton home two days later, at which time they confiscated the couch and stored it at the police department.

Shortly thereafter, when it was subsequently determined that the bloodied couch, which apparently emitted an unpleasant odor, was both a fire and health hazard, the police, with the consent of the office of the Mercer County Prosecuting Attorney, disposed of the couch at the Mercer County landfill. Prior to discarding it, however, the police failed to measure either the proportions of the couch, the location of the bullet hole on the couch, or the trajectory of the bullet. The police likewise failed to properly photograph either the couch or the bullet hole. Though several photographs were taken, they depict only portions of the couch and are essentially of no evidentiary value.

In May of 1993, almost two years after the death of Chandel Fleetwood, a passerby discovered the skeletal remains later determined to be those of Fleetwood. Appellant, who had no prior criminal record, was later arrested by the Mount Vernon (New York) Police Department. In a videotaped statement admitted at trial, appellant recounted Fleetwood's death by Russian Roulette and the subsequent panic experienced by him and

---

1. In a videotaped statement introduced at trial, appellant stated that he and the others were involved in the drug trade. Appellant was apparently the "enforcer" for the group and, according to the preliminary hearing testimony of Detective Jones, would travel to Bluefield to straighten out the group's "money affairs." However, significantly, the evidence of drugs and money was not pursued at appellant's trial. During an *in camera* proceeding just prior to the commencement of trial, the prosecutor stated: "Your Honor, the [appellant's] role in this ring, was the enforcer. We had certain evidence of that, but I do not feel that we could tie it in with the actual murder itself.... I think [appellant] mentions in his statement about coming down here for the purpose of selling drugs, but we didn't bring the people in the area who knew what they sold."

2. Allison Charlton, at whose residence and on whose couch Chandel Fleetwood was shot, testified that the couch was sat, slept and played upon during the seven months following the shooting.

3. At the preliminary hearing, Detective Jones described his observation of the direction of the bullet through the couch:

   [The] bullet hole was in the back of the couch, on the top cushion on the back, and it went down. If you're facing the couch and the seat part is in front of you, it went down from a left to right angle.

the others who were present, leading them to dispose of the body in a nearby wooded area.[4]

The only evidence that Chandel Fleetwood had been murdered was the trial testimony of Dr. Irvin Sopher, medical examiner for the State of West Virginia. Dr. Sopher testified that in March of 1992, approximately nine months after Fleetwood's death but approximately fourteen months before his body was found, Detective Jones delivered to him the bullet, blood samples and bone fragments. In addition, Detective Jones, drew, from memory, a diagram of the couch, which obviously included no information as to its height, width or length or the location of the bullet hole in relation thereto.

At trial, in January of 1994, it was revealed that the diagram of the couch drawn from memory by Detective Jones for Dr. Sopher had been lost. Nevertheless, during direct examination, Dr. Sopher, who had never seen the couch, drew Detective Jones' couch diagram from memory. Dr. Sopher testified that based upon examination of the skull and the purported right to left, straight line trajectory of the bullet through the couch, the manner of death of Chandel Fleetwood was homicide. Dr. Sopher testified that he came to this conclusion when he lined up the trajectory of the bullet through the skull with the right to left path of the bullet through the couch, as drawn by Detective Jones. Dr. Sopher determined that Fleetwood was held down on the couch and was shot through the head, with the bullet travelling in a straight line.[5] It is clear from Dr. Sopher's testimony that the trajectory of the bullet through the couch was paramount to his determination that Chandel Fleetwood's death was the re-

4. According to appellant's statement, the following day, he and one of the others, Marcel Myers, moved Fleetwood's body approximately five to ten feet further into the woods.

5. The following pertinent inquiry and exchange with Dr. Sopher occurred on direct examination:

A: If I just have this skull without any other information, I cannot, on that basis alone, determine this victim died as a result of a homicide, or an accidental weapon discharging, or a possible suicide. But, that would not be a very likely possibility because of the angle of the gunshot. I cannot on those basis, alone, determine whether this case is a homicide, or very likely a suicide, unless we find out more about the circumstances surrounding the death.... Maybe it was an accidental shooting, but with that type of a path, certainly a homicide would be the main consideration, but without other information from the law enforcement a manner of death to any degree of certainty cannot be established.... That's why I gather the information from the police investigation of the circumstances of the death and in conjunction with the medical finding and the body and we come to a conclusion.... A lot of questions cannot be answered by the body alone, so we look to the investigation to correlate with the body findings to arrive at the manner of death. The medical findings and the police investigation establishes, well, is this a homicide or an accident or a suicide.
....
Q: Now, in March [of 1992], you had no way of knowing where the bullet had entered and exited because it could have been in any part of the body, you just had the bone fragments and the blood and the bullet?

A: That's correct.
Q: But, did the officers, when they talked to you in March of '92—well, did Detective Jones ever make a diagram for you that was helpful to you in reaching your conclusion as to the cause of death?
A: That's correct.
Q: Would you step down here to the blackboard. Approximately a year prior to finding the skeletal remains of Chandel Fleetwood, would you show the jury the drawing that Detective Jones did for you that played an important part in your results and conclusions.
A: At the time, of course, that I was shown the stuffing and the bone fragments and the bullet, keeping in mind this was in March of '92 and the skeleton was found 14 months later. (Witness demonstrating.) The drawing presented to me was a 3 cushion couch, with this being the seat back and this is the bottom pillow, which you sit upon. This is the bottom of the couch and the legs. There was like an armrest on each side. So, this is the couch when you face the couch. It was sitting against a far wall and on the righthand seat back cushion was the defect in the top portion of the couch, roughly over like so (demonstrating) and the destructive path of this bullet.
....
Q: Of course, you didn't examine this couch?
A: No, this was told to me by law enforcement people.
....
Q: What is your opinion, Doctor, as to manner of this death?
A: In my opinion *it is a homicide, based upon the alignment of the bullet and the skull on the couch.*
(emphasis added).

sult of a homicide, and not suicide.[6]

Appellant introduced several experts whose testimony directly challenged significant aspects of the State's evidence. Ronald W. Dye, a firearms examiner and forensic scientist testified that the trajectory of a bullet through a couch could not be accurately determined where the couch had subsequently been sat, slept and played upon for seven months. Mr. Dye testified that, in light of the activity which occurred on the couch but depending on the amount of stuffing in the couch, the bullet may have moved from the sight where it was originally lodged. Given that the couch was destroyed prior to trial, Mr. Dye was obviously unable to examine it.

Furthermore, Mr. Dye indicated that is unlikely that a bullet which passes through a body and a couch will travel in a straight line, as Dr. Sopher testified. Mr. Dye further indicated that a hollow point bullet, such as the one extracted from the couch, "deforms and mushrooms" thereby changing the flight path of the bullet from a straight line path. Finally, Mr. Dye testified that if he were unable to see the bullet through the bullet hole in the couch, he would have x-rayed the couch in order to locate it and then, using a scientific equation, would have been able to accurately determine the angle of the bullet.

In addition to the expert testimony of Mr. Dye, appellant introduced expert William Anthony Cox, a forensic pathologist. Dr. Cox examined the skull of Chandel Fleetwood, particularly the entrance and exit wound of the bullet, and testified that it is impossible to determine that the bullet travelled in a straight line, as Dr. Sopher testified. Dr. Cox concurred with Mr. Dye's testimony that a hollow point bullet tends to easily deform when it hits a hard object such as bone. As a result, the bullet deviates from its straight line path.

Moreover, Dr. Cox disagreed with Dr. Sopher's conclusion that Fleetwood's head was pressed against a couch cushion based upon the fact that bone fragments were found in the couch. Dr. Cox stated that when a bullet travels through a skull, it carries with it bone and other matter. Thus, the fact that bone fragments were found in the couch does not necessarily mean that Fleetwood's head was held down against a cushion when the weapon was discharged. Finally, Dr. Cox indicated that the couch diagram drawn by Dr. Sopher had no validity.

At the close of all the evidence, the prosecutor, in closing argument, stated: "We don't know why he was killed. I, also, cannot tell you who pulled the trigger. We just know that it was murder. You just can't ignore it, but we don't know everything that happened, but we do know it was murder." Appellant was subsequently convicted of first-degree murder and sentenced to life imprisonment with a recommendation of mercy.

## II.

Appellant's primary assignment of error is that his due process rights were violated when the trial court permitted the State to introduce evidence from the couch which appellant was never afforded an opportunity to examine and which was destroyed prior to trial. As the facts indicate, the purported trajectory of the bullet through the couch was crucial to Dr. Sopher's determination that the manner of death of Chandel Fleetwood was homicide, and not suicide.

### A.

It is the State's contention that evidence from the couch was properly admitted at trial because the police did not act in bad faith when they discarded the couch considering there was no body and no identifiable suspects. The State relies primarily upon the United States Supreme Court's decision in *Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), in which it held that unless a criminal defendant can

---

6. The State also introduced the testimony of witness Dwight Campbell, who had been in police custody on miscellaneous drug and firearm charges. Mr. Campbell, an acquaintance of appellant, testified that on the day following appellant's release from jail on the murder charge, appellant said that "they were playing around with a gun and they were drinking and they were playing Russian Roulette and [Marcel Myers] picked up the gun and there was one bullet in it and that was what killed his friend."

show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law under the Fourteenth Amendment of the *United States Constitution.*

The United States Supreme Court's decision in *Arizona* was, admittedly, a re-examination of " 'what might loosely be called the area of constitutionally guaranteed access to evidence.' " *Arizona,* 488 U.S. at 55, 109 S.Ct. at 336, 102 L.Ed.2d at 287 (*quoting United States v. Valenzuela–Bernal,* 458 U.S. 858, 867, 102 S.Ct. 3440, 3446, 73 L.Ed.2d 1193 (1982)). The *Arizona* decision was preceded by three significant cases which developed the area of constitutionally guaranteed access to evidence. In *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215, 218 (1963), the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

Subsequently, in *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the United States Supreme Court held that the prosecution had a duty to disclose exculpatory evidence even though no requests were made for it. The rules set forth in *Brady* and *Agurs* have been incorporated into the jurisprudence of West Virginia. *See* syl. pt. 4, *State v. Hatfield,* 169 W.Va. 191, 286 S.E.2d 402 (1982) ("A prosecution that withholds evidence which if made available would tend to exculpate an accused by creating a reasonable doubt as to his guilt violates due process of law under Article III, Section 14 of the West Virginia Constitution.").[7] *See also* syl. pt. 4, *State v. Fortner,* 182 W.Va. 345, 387 S.E.2d 812 (1989); syl. pt. 1, *State v. Hall,* 174 W.Va. 787, 329 S.E.2d

860 (1985); *State v. McArdle,* 156 W.Va. 409, 194 S.E.2d 174 (1973).

In *California v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), two defendants, accused of drunken driving in unrelated incidents, submitted to breath-analysis tests, each registering a blood alcohol concentration high enough to presume intoxication under California law. Each defendant sought to suppress their respective test results on the ground that the police failed to preserve their breath samples, even though it was standard police procedure not to preserve such samples. Both defendants maintained that had their respective breath samples been preserved, their breath-analysis test results could have been impeached.

The United States Supreme Court rejected the defendants' arguments in *Trombetta* because, among other reasons, the police discarded the samples " 'in good faith and in accord with normal practice.' " *Trombetta,* 467 U.S. at 488, 104 S.Ct. at 2533, 81 L.Ed.2d at 422 (*quoting Killian v. United States,* 368 U.S. 231, 82 S.Ct. 302, 7 L.Ed.2d 256 (1961). The *Trombetta* court further determined that the chances were slim that the preserved breath samples would have exculpated the defendants in that case and, even if the samples would have revealed inaccuracies in the breath-analysis test, the defendants had "alternative means of demonstrating their innocence." *Trombetta,* 467 U.S. at 489–90, 104 S.Ct. at 2534, 81 L.Ed.2d at 423. A state's constitutional duty to preserve evidence can only be applied to "evidence that might be expected to play a significant role in the suspect's case." *Id.* at 488, 104 S.Ct. at 2534, 81 L.Ed.2d at 422 (footnote omitted). Under *Trombetta,* the standard of constitutionality is met where evidence possesses "an exculpatory value that was apparent before the evidence was destroyed, and [was] of such a nature that the defendant would be unable

---

7. In *Hatfield,* we reiterated the United States Supreme Court's standard of evaluating whether the prosecution's failure to disclose evidence is of constitutional proportions requiring the prosecutor to disclose it absent a request to do so:

    [I]f the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no

reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.

*Hatfield,* 169 W.Va. at 205, 286 S.E.2d at 411 (*quoting Agurs,* 427 U.S. at 112–13, 96 S.Ct. at 2402, 49 L.Ed.2d at 355 (footnote omitted)).

to obtain comparable evidence by other reasonably available means." *Id.* 467 U.S. at 489, 104 S.Ct. at 2534, 81 L.Ed.2d at 422.

In *Arizona,* the police failed to preserve semen samples from the victim's body and clothing where the defendant was accused, *inter alia,* of child molestation and sexual assault. In that the defendant's primary defense was that of mistaken identity, his expert testified as to what might have been revealed by tests promptly performed on the samples or by tests performed on the samples on the victim's clothing had the clothing been properly refrigerated. The trial court instructed the jury that "if they found the State had destroyed or lost evidence, they might 'infer that the true fact is against the State's interest.'" *Arizona,* 488 U.S. at 54, 109 S.Ct. at 335, 102 L.Ed.2d at 287.

Though the jury found the defendant guilty as charged, the Arizona Court of Appeals reversed, concluding that even though there was no bad faith on the part of the police, "'"when identity is an issue at trial and the police permit the destruction of evidence that could eliminate the defendant as the perpetrator, such loss is material to the defense and is a denial of due process."'" *Arizona,* 488 U.S. at 54, 109 S.Ct. at 335, 102 L.Ed.2d at 287, (*quoting State v. Youngblood,* 153 Ariz. 50, 54, 734 P.2d 592, 596 (Ct.App. 1986) and *State v. Escalante,* 153 Ariz. 55, 61, 734 P.2d 597, 603 (Ct.App.1986)).

The United States Supreme Court in *Arizona* found that the prosecution had dutifully complied with *Brady* and *Agurs* when it disclosed relevant police and laboratory reports on the semen samples and provided access of those samples to the defendant's experts. *Arizona,* 488 U.S. at 55, 109 S.Ct. at 336, 102 L.Ed.2d at 288. The question then became whether the defendant would prevail on federal constitutional grounds because of "some constitutional duty over and above that imposed by cases such as *Brady* and *Agurs*[,]" such as that which was set forth in *Trombetta. Arizona,* 488 U.S. at 56, 109 S.Ct. at 336, 102 L.Ed.2d at 288. The *Arizona* Court concluded that, although the preserved materials may have enabled the defendant to exonerate himself, the State did not attempt to make any use of the materials in its own case in chief. *Id.*

In *Arizona,* the United States Supreme Court uttered its latest word on the loss or destruction of evidence by police and limited a defendant's right of federal due process to those instances where the police have acted in bad faith:

> The Due Process Clause of the Fourteenth Amendment, as interpreted in *Brady,* makes the good or bad faith of the State irrelevant when the State fails to *disclose* to the defendant material exculpatory evidence. But we think the Due Process Clause requires a different result when we deal with the failure of the State to *preserve* evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant. Part of the reason for the difference in treatment is found in the observation made by the Court in *Trombetta, supra,* [467 U.S.] at 486 [104 S.Ct. at 2533], that '[w]henever potentially exculpatory evidence is permanently lost, courts face the treacherous task of dividing the import of materials whose contents are unknown and, very often, disputed.' Part of it stems from our unwillingness to read the 'fundamental fairness' requirement of the Due Process Clause, see *Lisenba v. California,* 314 U.S. 219, 236 [62 S.Ct. 280, 289–90, 86 L.Ed. 166] (1941), as imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution. We think that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, *i.e.,* those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant. We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.

*Id.* 488 U.S. at 57–58, 109 S.Ct. at 337, 102 L.Ed.2d at 289 (emphasis added).

██ Thus, as a matter of federal constitutional law, appellant must show that the Bluefield Police Department acted in bad faith in discarding the couch at the local landfill shortly after it was taken from Allison Charlton's home in March of 1992. While there was an on-going investigation as to the origin of the bullet hole through the couch, there were no identifiable suspects or a victim at the time the couch was destroyed. The police clearly acted negligently in disposing of evidence which was so obviously a part of a pending police investigation. However, we cannot say from the record that their actions were motivated by bad faith. Thus, under *Arizona, supra,* the destruction of the couch did not violate appellant's federal right of due process.

### B.

Disposition of appellant's federal due process rights, under *Arizona v. Youngblood,* does not necessarily resolve his right of due process under *West Virginia Constitution* art. III, §§ 10 and 14.[8] Indeed, several jurisdictions have found the holding in *Arizona* to be too narrow in that it restricts due process violations only to cases where a defendant can show bad faith, even where evidence, negligently lost or destroyed, might fatally prejudice a defendant. *State v. Delisle,* 648 A.2d 632, 643 (Vt.1994).

Several courts have looked instead to the concurring opinion in *Arizona* as an alternative means of determining a defendant's state constitutional right of due process. *See also Trombetta,* 467 U.S. at 491, 104 S.Ct. at 2535, 81 L.Ed.2d at 424 ("Rules concerning [the] preservation of evidence are generally matters of state, not federal constitutional, law." (O'Connor, J., concurring) (citation omitted)). In the concurring opinion of *Arizona,* Justice Stevens wrote, in relevant part: "[T]here may well be cases in which the defendant is unable to prove that the State acted in bad faith but in which the loss or destruction of evidence is nonetheless so critical to the defense as to make a criminal trial fundamentally unfair." *Id.* 488 U.S. at 61, 109 S.Ct. at 339, 102 L.Ed.2d at 291 (Stevens, J., concurring).[9]

In this spirit, the Supreme Court of Delaware has examined a state's failure to preserve evidence requested by a criminal defendant according to the following paradigm:

'1) would find the requested material, if extant in the possession of the State at the time of the defense request, have been subject to disclosure under Criminal Rule 16[10] or *Brady?*

---

8. This Court has recognized that both *West Virginia Constitution* art. III, §§ 10 and 14 protect a criminal defendant's right of due process of law.

    *W.Va. Const.* art. III, § 10 provides: "No person shall be deprived of life, liberty, or property, without due process of law, and the judgment of his peers." *See State v. Neuman,* 179 W.Va. 580, 371 S.E.2d 77 (1988).

    In *State v. Hatfield, supra* and *State v. Thomas,* 187 W.Va. 686, 421 S.E.2d 227 (1992), we specifically recognized that due process requires prosecutors to reveal to a criminal defendant all potentially exculpatory evidence, pursuant to *W.Va. Const.* art. III, § 14.

    *W.Va. Const.* art. III, § 14 provides:

    Trials of crimes, and misdemeanors, unless herein otherwise provided, shall be by a jury of twelve men, public, without unreasonable delay, and in the county where the alleged offence was committed, unless upon petition of the accused, and for good cause shown, it is removed to some other county. In all such trials, the accused shall be fully and plainly informed of the character and cause of the accusation, and be confronted with the witness against him, and shall have the assistance of

counsel, and a reasonable time to prepare for his defence; and there shall be awarded to him compulsory process for obtaining witnesses in his favor.

9. *See, e.g., Ex parte Gingo,* 605 So.2d 1237, 1241 (Ala.1992); *Hammond v. State,* 569 A.2d 81, 87 (Del.1989); *State v. Matafeo,* 71 Haw. 183, 787 P.2d 671, 673 (1990); *Commonwealth v. Henderson,* 411 Mass. 309, 582 N.E.2d 496, 497 (1991).

10. Rule 16(a)(1)(C) of the Superior Court Criminal Rules of Delaware, the applicable rule in *Hammond,* is virtually identical to Rule 16(a)(1)(C) of the *West Virginia Rules of Criminal Procedure,* which states:

    (a) Disclosure of Evidence by the State.
    (1) Information Subject to Disclosure.
    (C) Documents and Tangible Objects.—Upon request of the defendant, the state shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, which are within the pos-

'2) if so, did the government have a duty to preserve the material?

'3) if there was a duty to preserve, was the duty breached, and what consequences should flow from a breach?'

*Hammond v. State,* 569 A.2d 81, 86 (Del. 1989) (*quoting Deberry v. State,* 457 A.2d 744, 750 (Del.1983)) (footnote added). In determining what consequences should flow from a breach of the State's duty to preserve evidence, the *Hammond* court employed the following three-part analysis:

' "1) the degree of negligence or bad faith involved,

' "2) the importance of the missing evidence considering the probative value and reliability of secondary or substitute evidence that remains available, and

' "3) the sufficiency of the other evidence produced at the trial to sustain the conviction." '

*Hammond,* 569 A.2d at 86 (*quoting Bailey v. State,* 521 A.2d 1069, 1092 (Del.1987) and *Deberry,* 457 A.2d at 752) (footnote omitted). *See State v. Delisle,* 648 A.2d 632, 642–43 (Vt.1994) (the court conducted a "pragmatic balancing" of the state's negligence or bad faith; the importance of the evidence lost; and other evidence of guilt adduced at trial); *Thorne v. Department of Public Safety,* 774 P.2d 1326, 1331 (Alaska 1989); *Commonwealth v. Henderson,* 411 Mass. 309, 582 N.E.2d 496 (1991).

■ We find the aforementioned cases to be persuasive. Indeed, we have previously set our state constitutional protections, in some instances, at a higher level than that accorded by the federal constitution: " 'The provisions of the Constitution of the State of West Virginia may, in certain instances, require higher standards of protection than afforded by the Federal Constitution.' Syllabus Point 2, *Pauley v. Kelly,* 162 W.Va. 672, 255 S.E.2d 859 (1979)." Syl. pt. 1, *State v.*

*Bonham,* 173 W.Va. 416, 317 S.E.2d 501 (1984).

■ As a matter of state constitutional law, we find that fundamental fairness requires this Court to evaluate the State's failure to preserve potentially exculpatory evidence in the context of the entire record. *Hammond,* 569 A.2d at 87. *See State v. James,* 186 W.Va. 173, 411 S.E.2d 692 (1991). *See also State ex rel. Peck v. Goshorn,* 162 W.Va. 420, 422, 249 S.E.2d 765, 766 (1978) ("[d]ue process of law is synonymous with fundamental fairness").

■ When the State had or should have had evidence requested by a criminal defendant but the evidence no longer exists when the defendant seeks its production, a trial court must determine (1) whether the requested material, if in the possession of the State at the time of the defendant's request for it, would have been subject to disclosure under either *West Virginia Rule of Criminal Procedure* 16 or case law; (2) whether the State had a duty to preserve the material; and (3) if the State did have a duty to preserve the material, whether the duty was breached and what consequences should flow from the breach. In determining what consequences should flow from the State's breach of its duty to preserve evidence, a trial court should consider (1) the degree of negligence or bad faith involved; (2) the importance of the missing evidence considering the probative value and reliability of secondary or substitute evidence that remains available; and (3) the sufficiency of the other evidence produced at the trial to sustain the conviction. We shall now examine this case in accordance with the aforementioned principles.

The evidence requested by appellant—the couch on which Chandel Fleetwood died—would have been discoverable under Rule

---

session, custody and control of the state, and which are material to the preparation of his defense or are intended for use by the state as evidence in chief at the trial, or where obtained from or belonging to the defendant. *See generally, State ex rel. Rusen v. Hill,* 193 W.Va. 133, 454 S.E.2d 427, 433 (1994) ("Discovery is one of the most important tools of a criminal defendant. The purpose of Rule 16(a),

our basic discovery rule in criminal cases, is to protect a defendant's right to a fair trial. The degree to which that right suffers as a result of a discovery violation cannot be determined by simply asking would the nondisclosed information enhance or destroy the state's case. A significant inquiry is how would the timely access of that information have affected the success of a defendant's case.")

16(a)(1)(C) of the *West Virginia Rules of Criminal Procedure, supra.* Considering that appellant's defense was that Fleetwood died as a result of suicide, the couch, and particularly the trajectory of the bullet through it, would clearly have been evidence "material to the preparation of [his] defense." *W.Va.R.Crim.P.* 16(a)(1)(C).[11] Thus, if the couch had been in the possession of the State when appellant requested it for inspection, it would have been discoverable under *W.Va. R.Crim.P.* 16(a)(1)(C).[12]

We must next determine whether the State had a duty to preserve the discoverable evidence. An accused's right to a fair trial and to fair cross-examination of witnesses against him "require[s] that the State be prepared to provide a defendant with a reasonable opportunity to examine adverse evidence presented by the State's experts." *State v. Thomas,* 187 W.Va. 686, 691–92, 421 S.E.2d 227, 233–34 (1992). To that end, we have held that

> [w]hen the government performs a complicated test on evidence that is important to the determination of guilt, and in so doing destroys the possibility of an independent replication of the test, the government must preserve as much documentation of the test as is reasonably possible to allow for a full and fair examination of the results by a defendant and his experts.

*Id.* at syl. pt. 4. The present case did not involve the performance of "complicated testing" on the evidence, nor did its destruction result from such testing. Nevertheless, Detective Jones' determination of the trajectory of the bullet through the couch was clearly important to the determination of appellant's guilt. The police not only destroyed the couch, but it failed to take any measurements of it or of the bullet hole in relation thereto. The police further failed to properly photo-graph it. Thus, appellant was foreclosed from fully and fairly examining Detective Jones' determination of the trajectory of the bullet and, more significantly, Dr. Sopher's subsequent conclusion of homicide based on Detective Jones' determination of the trajectory. We find, therefore, that the State breached its duty to preserve evidence in this case in that it destroyed the couch, failed to take measurements of it and, further, to properly photograph it.

The final step in our analysis requires application of a three-part analysis to determine the consequences which should flow from the State's breach of its duty to preserve the couch. The first factor to be considered is "the degree of negligence or bad faith involved." Appellant does not assert that the police destroyed the couch in bad faith nor does the record so suggest in that there was neither a body nor any identifiable suspects at the time the couch was destroyed. However, considering that the police found a bullet, blood, hair and bone fragments in and around the couch, it was obviously a part of a pending police investigation. We therefore find that the police acted negligently in disposing of this evidence and in failing to measure or properly photograph it before doing so.

The second factor to be considered in determining what consequences should flow from the State's failure to preserve the couch is "the importance of the missing evidence considering the probative value and reliability of secondary or substitute evidence that remains available." As the facts indicate, a diagram of the destroyed couch was drawn, from memory, by Detective Jones for Dr. Sopher. Dr. Sopher testified that he compared the bullet hole in Fleetwood's skull with the bullet hole as it appeared in the

---

11. In his pre-trial motion to suppress any and all testimony concerning the seized couch, as well as any and all physical evidence gleaned therefrom, appellant maintained, *inter alia,* that "[t]he investigating officer testified at the preliminary hearing that the bullet path through the couch precluded [appellant's] suicide defense. [Appellant] argues that the placement of the bullet holes [sic] in this couch is exculpatory and would substantiate his suicide defense, particularly after being examined by a defense expert."

12. Determining whether the couch would have been discoverable under *Brady, supra,* or *Agurs, supra,* would be an " 'artificial exercise, since it is no longer available for examination or testing.' " *Hammond,* 569 A.2d at 88 (*citing Deberry,* 457 A.2d at 751 n. 5). *See Brady, supra; Agurs, supra; Hatfield, supra.*

diagram and in accordance with Detective Jones' determination of the trajectory of the bullet. However, the diagram on which Dr. Sopher had originally based his conclusion of homicide was, inexplicably, lost before trial. At trial, Dr. Sopher drew, from memory, a diagram of a couch which he never personally viewed but which was drawn for him almost two years earlier. It was from his own diagram that Dr. Sopher testified that Chandel Fleetwood died as a result of homicide. We seriously question the reliability of this evidence which was presented as a substitute for the destroyed couch.[13]

The final factor to be considered in determining the consequences which should flow from the State's failure to preserve the couch is "the sufficiency of the other evidence produced at the trial to sustain the conviction." The other evidence produced at trial included appellant's presence at the event of Chandel Fleetwood's death, as well as appellant's admission that he and the others disposed of the victim's body and revolver in the woods. The State also introduced the testimony of Dwight Campbell, who testified that, according to appellant, "they were playing around with a gun and they were drinking and they were playing Russian Roulette and [Marcel Myers] picked up the gun and there was one bullet in it and that was what killed [Fleetwood]." We recognize that the jury could have reasonably inferred from the remaining evidence that appellant might somehow have been involved in Fleetwood's death. However, the record is clear that Dr. Sopher, whose testimony was so critical to the prosecution's case, could not have concluded that Fleetwood's death was the result of homicide without the evidence of the trajectory of the bullet through the missing couch. See n. 4, *supra.*

The question now before us is what consequences should flow from the State's failure to preserve the couch. *Hammond,* 569 A.2d at 90. Appellant had filed a motion in limine to suppress all testimony and evidence from the destroyed couch. This motion was denied by the trial judge without explanation. Following both the State's case-in-chief and the guilty verdict by the jury, appellant's counsel made motions for directed verdicts of acquittal. Both of these motions were likewise denied, without comment by the trial judge.

■ In his charge to the jury, the trial judge included the following instruction regarding the missing evidence:

The Court instructs the jury that the State has introduced evidence gleaned from a couch which no longer exists. The reason this couch no longer exists is because the officers of the Bluefield City Police Department destroyed it after conferring with the Prosecuting Attorney's Office.

In considering this evidence, you should scrutinize it with great care and caution. This destruction of evidence occurred before the defendant could examine it. This destruction of the couch may very well have deprived the defendant of evidence crucial to his defense and which may in fact have exculpated him.

We find that this instruction, under the circumstances of this case, was not sufficient to protect appellant's right of due process under *W.Va. Const.* art. III, §§ 10 and 14. We hold that appellant's trial was so fundamentally unfair as a result of the admission of evidence regarding the destroyed couch that appellant is entitled to a new trial. Appellant's conviction of first degree murder is therefore reversed and this case is remanded for a new trial.[14]

13. Moreover, photographs taken of the couch prior to its destruction showed only portions of the couch and the blood found on it. As we previously indicated, these photographs were of no probative evidentiary value.

14. We note, however, that reversal of conviction will not always be the appropriate consequence which should flow from the State's breach of its duty to preserve evidence. In his concurring opinion in *Arizona,* Justice Stevens found signifi-

cant the fact that the trial court instructed the jury that if they found that the State had " 'allowed to be destroyed or lost any evidence whose content or quality are in issue, *you may infer that the true fact is against the State's interest.' As a result, the uncertainty as to what the evidence might have proved was turned to the defendant's advantage." Arizona,* 488 U.S. at 59–60, 109 S.Ct. at 338, 102 L.Ed.2d at 290 (emphasis added). *See Hammond,* 569 A.2d at 90 n. 22. In the present case, even if such an instruction were

## III.

Appellant's second assignment of error is that the trial court committed reversible error when it permitted testimony given by the victim's mother at the trial of a co-defendant to be read to the jury. Appellant maintains that the admission of this testimony violated his right to confront witnesses against him, under the Sixth Amendment of the United States Constitution.[15]

The record reveals that during pre-trial motions, the State indicated that Peggy Brown, the victim's mother, would not be available to testify at appellant's trial. The State then requested that it be permitted to read the testimony elicited from Ms. Brown several months earlier at the trial of co-defendant Marcel Myers. Appellant's counsel's sole response to the State's motion was as follows: "Your Honor, the only problem I have with the motion is that Marcel Myers['] name appears throughout the transcript, but other than that I don't have any real problem with the motion."

Subsequently, when the State introduced Ms. Brown's testimony during its case-in-chief, appellant's counsel made a general objection.[16] Presumably, appellant's objection was in reference to his pre-trial objection regarding the appearance of Marcel Myers' name throughout the transcript. We thus find no merit in appellant's contention on appeal that the trial court improperly foreclosed his right to confront and cross-examine Ms. Brown.

As we have previously held, "[t]his Court will not consider an error which is not preserved in the record nor apparent on the face of the record." Syl. pt. 6, *State v. Byers*, 159 W.Va. 596, 224 S.E.2d 726 (1976). *See* 1 Franklin D. Cleckley, *Handbook on Evidence for West Virginia Lawyers* § 1-7(C)(2) p. 77 (3d ed. 1994) ("where the objection to the admission of testimony is based upon some specified ground, the objection is then limited to that precise ground and error cannot be predicated upon the overruling of the objection, and the admission of the testimony on some other ground, since specifying a certain ground of objection is considered a waiver of other grounds not specified." *quoting Leftwich v. Inter-Ocean Cas. Co.*, 123 W.Va. 577, 17 S.E.2d 209 (1941)).[17] Accordingly, we find that the admission of Ms. Brown's testimony from a previous trial was not error.

## IV.

Appellant's third assignment of error is that the prosecutor's cross-examination of defense experts as to the fees they expected to receive for their work and testimony constitutes a denial of appellant's right of due process. However, the record reveals that appellant's counsel failed to object to this line of questioning. Therefore, the admission of this testimony must invoke the plain error

given, it would not have sufficiently protected appellant's due process rights.

**15.** *See State v. Eye*, 177 W.Va. 671, 673, 355 S.E.2d 921, 923 (1987) ("The confrontation clause of the Sixth Amendment to the United States Constitution, coupled with the Fourteenth Amendment, guarantees the right of an accused in a criminal prosecution to confront the witnesses against him. *See State ex rel. Hawks v. Lazaro*, 157 W.Va. 417, 440, 202 S.E.2d 109, 124 (1974); W.Va. Const. Art. III § 14. This right of confrontation means more than simply being allowed to physically confront the witness. *See Davis v. Alaska*, 415 U.S. 308, 315, 94 S.Ct. 1105, 1109, 39 L.Ed.2d 347 (1974). Indeed, the main purpose of the confrontation is to secure for the defendant the opportunity of cross-examination. 415 U.S. at 315-16, 94 S.Ct. at 1109-10.")

**16.** *See W.Va.Evid.* 103(a)(1), which provides:

(a) Effect of Erroneous Ruling.—Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and (1) Objection.—In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context[.]

**17.** On retrial of this case, we direct the parties' attention to this Court's decision in *State v. James Edward S.*, 184 W.Va. 408, 400 S.E.2d 843 (1990) wherein we set forth, in detail, when a prior statement by a witness may be admitted at trial, in lieu of the witness' direct testimony, without violating the Confrontation Clause of the Sixth Amendment to the *United States Constitution*.

doctrine before this Court will reverse appellant's conviction on this basis.[18]

■ In syllabus point 7 of *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995), this Court held:

> To trigger application of the 'plain error' doctrine, there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings.

*See also* syl. pt. 4, in relevant part, *State v. England*, 180 W.Va. 342, 376 S.E.2d 548 (1988) (The plain error "doctrine is to be used sparingly and only in those circumstances where substantial rights are affected, or the truth-finding process is substantially impaired, or a miscarriage of justice would otherwise result.")

Upon review of the record, we find that the prosecutor's cross-examination of appellant's experts regarding their fee arrangements affected neither appellant's substantial rights nor the fairness, integrity or public reputation of his criminal trial.[19]

### V.

For reasons discussed herein, the judgment of conviction rendered in the Circuit Court of Mercer County is hereby reversed and this case is remanded for a new trial.

Reversed and remanded.

BROTHERTON and RECHT, JJ., did not participate.

FOX, Judge, and MILLER, Retired J., sitting by temporary assignment.

---

**18.** In syllabus point 2 of *State v. Stewart*, 187 W.Va. 422, 419 S.E.2d 683 (1992), we held: " ' "Error in the admission of testimony to which no objection was made will not be considered by this Court on appeal or writ of error, but will be treated as waived." Syl. pt. 4, *State v. Michael*, 141 W.Va. 1, 87 S.E.2d 595 (1955).' Syllabus point 7, *State v. Davis*, 176 W.Va. 454, 345 S.E.2d 549 (1986)." However, *W.Va.R.Evid.* 103(d) states that "[n]othing in this rule precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the court."

**19.** In that this case is reversed based upon appellant's contention that evidence from the missing couch was improperly admitted at trial, it is not necessary that we address his final assignment of error that the jury's verdict was contrary to the law and evidence.