# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**State of West Virginia,**
**Plaintiff Below, Respondent**

**vs.)  No. 18-0990** (Kanawha County 17-F-280)

**James K.,**
**Defendant Below, Petitioner**

**FILED**
**April 20, 2020**
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner James K., by counsel George Castelle, appeals his conviction on one count of first-degree sexual abuse in violation of West Virginia Code § 61-8B-7, and three counts of sexual abuse by a parent, guardian, or custodian in violation of West Virginia Code § 61-8B -5. The State of West Virginia, by counsel Andrea Nease-Proper, filed a response in support of the circuit court's order. Petitioner filed a reply.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In April of 2016, the victim in this case, D.J., who was then about thirteen years old, told her mother that her stepfather, Petitioner James K., touched her inappropriately. When her mother failed to act, D.J. told a teacher and a school counselor about the abuse. The teacher notified Child Protective Services and the Charleston Police Department. Living in D.J.'s home at the time were petitioner, his wife, and three other female children. The oldest child, S.K., was petitioner's teenage daughter from a prior relationship; the next oldest child, D.J., the victim in this case, was petitioner's wife's daughter from another relationship, i.e., petitioner's stepdaughter; the other two children were petitioner's and his wife's preschool daughters, B.K. and C.K. The four girls shared a small bedroom that contained two sets of bunk beds. Sometimes the younger sisters slept with the older sisters in the top bunks.

On April 7, 2016, D.J. was interviewed by Maureen Runyon at the Children's Advocacy Center (the "CAC"). During the interview, D.J. stated the following: When she was eleven years old and in the sixth grade, petitioner had a "birds and bees" talk with her and told her about male and female masturbation. She claimed that later the same day, petitioner rubbed her "down there" (D.J.'s name for her vagina) and touched her breasts under her bra. D.J. said she did not tell anyone what happened because she thought no one would believe her. D.J. said the abuse began again

1

about two weeks later and, thereafter, took place in the bedroom that she shared with her three sisters. She said she slept on a top bunk of one of the two sets of bunk beds in the room, and that petitioner would touch her on an every-other-night basis. She said her sisters did not awaken while petitioner was abusing her because "he was so cautious about whatever he freaking did. He was like- if [S.K.] would even, or [B.K.] or [C.K.] would even move in the bed, then he'd stop." D.J. said the first few times petitioner abused her, he threatened to kill her mother or to hurt D.J. if she told. D.J. said that in September of 2015, petitioner began having intercourse with her from "the back" (anal intercourse) in her top bunk and that it hurt. She said he would ejaculate on the sheets or blankets and she would have to wash them. D.J. said this would occur once or twice a week. D.J. said petitioner last had anal intercourse with her about two weeks before the CAC interview, but that he had touched her sexually just days before, which was what prompted her to tell her mother that petitioner had been touching her.

D.J. also told Ms. Runyon that petitioner never had vaginal intercourse with her, but sometimes he would pick her up off the top bunk, place her on the bottom bunk when one of the younger children was not sleeping in it, and perform oral sex on her. She said he never told her what to do and treated her "like a freaking ragdoll and he just did whatever he wanted to." She said he tried to get her to perform oral sex on him but she resisted. She believed that he was afraid of pushing her too hard because she might tell on him. D.J. said her sisters were all very sound sleepers and never woke up, and that her mother never caught him because she had been pregnant, slept a lot, and, after the baby came, she slept in the living room with the baby. D.J. did not believe petitioner had abused the other three girls, because she is the only stepchild and because he did not pay much attention to them. She was afraid petitioner would get her mother to hate her. She was also afraid that her sisters would hate her if she told on petitioner and that he would hurt her. D.J. said that when she got into trouble, petitioner would hit her with a belt or smack her in the mouth. D.J. said when she told her mother about petitioner's abuse, her mother confronted petitioner, who denied abusing D.J. D.J. said her mother claimed to believe D.J. but allowed petitioner to remain in the home. On the next day, Monday, April 4, 2016, D.J. told a teacher about the abuse (the teacher made a report to CPS that same evening). After school that Monday, petitioner arranged to be alone with D.J. in his car where he tried to convince her to "let everything go" because it was making her mother sick. On Tuesday, April 5, 2016, D.J. told her school counselor about the abuse. Thereafter, D.J. stayed for a while at her grandparents' house, which is adjacent to petitioner's and her mother's house. D.J. said that her mother got a protective order against petitioner on Wednesday, April 6, 2016. Following the CAC interview, D.J. was taken to the hospital for a medical examination, which revealed no evidence of sexual activity, abuse, or trauma.

Child Protective Services initiated civil abuse and neglect proceedings against petitioner and his wife in July of 2016. As part of those proceedings, and as authorized by Rule 8(b) of the West Virginia Rules of Procedure for Child Abuse and Neglect Proceedings, D.J.'s guardian ad litem asked the circuit court to interview D.J. in camera. The circuit court did so in the guardian's presence, but outside the presence of D.J.'s parents and their counsel. The circuit court told D.J. that the interview was private and that her parents would not see it. The circuit court also advised D.J. that the interview did not regard petitioner's abuse and, therefore, no questions would be asked about petitioner's abuse. Instead, the court said it wanted to discuss the allegations regarding D.J.'s mother's "failure to protect." During the interview, D.J. said she did not feel safe with her mother and petitioner. D.J. said she disclosed the abuse to her mother, but her mother did not believe her

2

and said D.J. had "demons" in her. D.J. said that petitioner made her feel guilty for disclosing the abuse. D.J. also said that she did not want her younger sisters going back to her mother because she did not believe her mother would protect them. She also did not believe her grandmother would protect her sisters.

Thereafter, petitioner's and his wife's parental rights to their children were terminated.

Returning to the criminal case, after D.J.'s in camera interview, detectives went to D.J.'s home a second time where they photographed her bedroom. However, the detectives did not collect any bedsheets, blankets, or mattresses (together the "bedding") from D.J.'s bed.

Detective Chris Cooper of the Charleston Police Department interviewed petitioner on April 12, 2016. Petitioner said that his wife dropped the protective order she had gotten against him, and that D.J.'s claims of sexual abuse were "100% false." He said he tried to connect with D.J. more than the other children because she was his stepdaughter. He admitted that he hit D.J. with a belt and smacked her in the mouth to discipline her. Petitioner claimed D.J. had one of her little sisters in bed with her 90% of the time and that he had never been on the top bunk. He admitted to having a "birds and bees" discussion with D.J., and to telling her how boys and girls masturbate. He also said he "might have shown her with [his] hand" how to masturbate without actually touching her. He admitted that D.J. saw him nude when one of the younger children pulled off his underwear during play, and that he regularly strips down to just his underwear after work. Petitioner claimed that on the day D.J. disclosed the abuse to her mother, he and D.J. had been in a fight over unwashed clothing. He also admitted that he talked to D.J. alone in his car the day after she told her teacher petitioner abused her in an effort to "get past it." Finally, he agreed to take a polygraph test.

Petitioner was interviewed a second time by Detectives Cooper during which petitioner took and failed a polygraph examination. Petitioner opined that he might have failed the test because he had had impure thoughts about D.J.

On May 16, 2016, CAC worker Ms. Runyon interviewed D.J. a second time. D.J. recanted her previous statement. D.J. said, "I've realized that I made a mistake and that I feel really, really bad with myself because I hurt a lot of people around me with the mistake I made and I'm- I feel bad because of the misery I put my family through." She said she was under no pressure to recant and that she made the decision to recant on her own because she wanted her family back together. She said she knew about sexual contact from her parents and television and she believed any problems would end if she recanted the story.

Ms. Runyon interviewed D.J. a third time on July 12, 2016. At the time, D.J. was living with her cousin Marjorie A. D.J. said she recanted her abuse claim because her mother and petitioner were putting "like ten million gallons of pressure" on her, and because petitioner told her she was tearing the family apart mentally and financially. D.J. said her parents told her that her younger sisters would grow up hating her because she forced their father to leave. She said her family blamed her for her mother getting ill, and that her grandparents would ask her nightly if she was lying, and eventually told her that they did not believe her. Her mother also blamed her for what the family was going through. D.J. said petitioner asked her to recant because it would make

3

her mother happy, and her mother told her to tell everyone she made a mistake. D.J. also said her mother stopped speaking to her after her first CAC interview, but began speaking to her again when she recanted during her second CAC interview. D.J. said petitioner had molested her again just a few days before when he put his hand down her pants and rubbed her as she sat with him in the living room. She also said that when her older stepsister came into the living room, petitioner pulled her (D.J.) into the laundry room and attempted to have anal intercourse with her and put his mouth and tongue on her labia. D.J. said her stepsister saw petitioner pull D.J. into the laundry room and that her stepsister called Marjorie A., who took D.J. to the hospital. D.J. also said she disclosed the abuse to her Aunt Sherry. D.J. said she no longer felt safe with her grandparents given that they lived next door to her mother and petitioner. Regarding the sisters' sleeping arrangement, D.J. said that one of her younger sisters often slept with her, but when she was alone in her bed, petitioner would touch her. Finally, D.J. said petitioner would climb the bunk bed's ladder into her upper bunk, and she did not know why it did not break given petitioner's size and weight.

On May 30, 2017, petitioner was indicted on nineteen counts: two counts of first-degree sexual abuse in violation of West Virginia Code § 61-8B-7, and seventeen counts of sexual abuse by a parent or guardian in violation of West Virginia Code § 61-8B-5.

On June 22, 2017, petitioner was arraigned and pled not guilty. The judge assigned to petitioner and his wife's abuse and neglect case was the same judge assigned to petitioner's criminal case. The court set petitioner's bond at $50,000 cash only, stating, "I would just say that I have more familiarity with this case than anybody in this courtroom."

On February 2, 2018, the circuit court conducted a hearing on petitioner's motion to be provided with a copy of D.J.'s statements in the abuse and neglect proceeding. The circuit court granted the motion and told the parties that she had recently had a second in camera discussion with D.J. and her guardian ad litem for the purpose of explaining the necessity of disclosing the transcript of her first abuse-and-neglect-related interview with D.J. to the parties.

On March 1, 2018, the parties met with the circuit court to inquire whether it would accept a one-count plea of sexual abuse by a parent or guardian, punishable by a sentence of ten to twenty years in prison, followed by fifty years of extended supervision and registry as a sex offender for life. The circuit court did not accept the agreement and said, among other things, that "I know there's enough evidence for you guys to get him on all counts." "The abuse and neglect lawyers already presented the entire criminal case." "You guys could have indicted him on a lot more." "The alleged victim is strong and will be fine if required to testify." "Based on what he did I won't accept anything less than three counts."[1]

On March 30, 2018, petitioner filed a motion to disqualify the circuit court judge claiming that her impartiality could reasonably be questioned given her apparent bias against petitioner. Petitioner highlighted that, in the abuse and neglect proceeding, the judge refused to give him a transcript of its in camera interview with D.J. Petitioner admitted that the judge thereafter gave

---

[1] The circuit court stated that although the quotes cited by petitioner were paraphrased, they were essentially accurate.

him the transcript for use in his criminal proceeding, but – before doing so – the judge met with D.J. to explain that the transcript would be disclosed. Petitioner also highlighted the comments made by the judge at the March 1, 2018, plea hearing.

The circuit court responded to petitioner's motion to disqualify with a letter to the Chief Justice of this Court stating that she would not voluntarily recuse itself. The judge highlighted that her first in camera interview with D.J. regarded D.J.'s mother's failure to protect D.J. in the abuse and neglect case, and not petitioner's alleged abuse. The judge further said that she met with D.J. a second time to explain to her that the court would allow the parties to see a transcript of the initial in camera interview, given that the court had assured D.J. that the initial interview would be confidential. The judge also said she told both sides that she knew more about the case than the parties did and, therefore, she would not accept the first plea to a single count *because the parties had not yet reviewed the recordings of D.J.'s CAC interviews*. The judge maintained that, having reviewed the transcriptions of the recorded CAC interviews, it was clear that a one count plea would be a miscarriage of justice and, therefore, she would not accept a plea to less than three counts. On April 16, 2018, the Chief Justice issued an administrative order denying petitioner's motion to disqualify.

Petitioner's criminal trial commenced on July 24, 2018. D.J. was called as the first witness. D.J.'s testimony matched the statements she made in her first and third interviews with Maureen Runyon.

Petitioner's oldest daughter, S.K., also testified. She described an incident occurring after D.J. recanted her statement and returned to the home. S.K. said petitioner asked her to take the younger children out of the living room and into the back room while he remained on the couch in the living room with D.J. S.K. testified that she was suspicious and, when she came back into the living room, D.J. and petitioner were in a compromising position. She then said petitioner and D.J. went into the laundry room and petitioner closed the door. S.K. said she had her younger sister knock on the laundry room door so that whatever was happening in there would stop. She said D.J. later told her that "it happened again" so she and D.J. called their cousin Marjorie A. seeking help.

Detective Cooper testified that he did not collect D.J.'s bedding because D.J. said she washed her sheets and blankets after petitioner abused her. The detective said he did not believe that any of the evidence gathered by the police was tested for semen or blood stains. He testified that D.J.'s bunk bed was slightly shorter than his own height of five feet, eight inches, and that petitioner was several inches taller than he was.

Marjorie A. testified that D.J. disclosed the abuse to her in April of 2016. Marjorie A. said that S.K. and D.J. called her and said petitioner had again abused D.J. She said she retrieved the two girls and took D.J. to the hospital for an examination.[2]

Marjorie A.'s daughter, Tabatha S., testified that D.J.'s family was very strict. Tabatha S. also said that, when D.J. was eleven or twelve years old, she saw petitioner force D.J. to sit on his lap and give him a kiss.

---

[2] The examination revealed no evidence of sexual activity, abuse, or trauma.

Dr. Joan Phillips of the CAC testified as an expert witness. She said she had testified at least one hundred times as an expert in child sexual abuse cases and had conducted approximately one thousand examinations of potential abuse victims. She testified that D.J. had a normal physical examination, but that ninety-five percent of the children she examines have no findings of physical trauma.

Ms. Runyon testified as an expert regarding her interviews of D.J. She noted that D.J.'s description of the alleged abuse was very detailed; D.J. answered quickly, using sensory details; and D.J. was more emotional during the second or "recantation" interview and could not say why she made up the story. Ms. Runyon also testified to D.J.'s third interview, when D.J. explained how her family had pressured her to recant. Ms. Runyon noted that the risk of recantation when a child is not believed by non-offending family members is fifty-six percent; when a child remains in the home where the offense occurred, the risk of recantation is between forty and fifty percent; and false accusations of sexual abuse occur only two percent of the time.

At the close of the State's case-in-chief, petitioner's counsel moved for a judgment of acquittal based insufficient evidence. The circuit court denied the motion.

Petitioner did not testify or call any witnesses on his own behalf.

Petitioner's counsel moved for the following jury instruction regarding the State's failure to collect and preserve D.J.'s bedding for the purpose of scientific testing:

> You've heard evidence that the State failed to collect or preserve the mattress and bed sheets of [D.J.] for the purpose of scientific testing. If you find that the State [] lost, destroyed, or failed to preserve evidence whose contents or quality are material to the issues in this case, you may infer that the true fact is against the State's interest, which in itself may create a reasonable doubt as to the defendant's guilt.

The trial court found that the instruction regarded spoliation of evidence, rather than a failure to collect evidence, and refused the instruction as the State was never in possession of D.J.'s bedding.

On closing, the defense pointed to the alleged "physical impossibility" of many of D.J.'s allegations, i.e., that petitioner weighed "well over 300 pounds, like 350 pounds" at the time of the alleged assaults and, therefore, could not have gotten onto D.J.'s top bunk and could not have sexually abused her "without shaking the whole bed, rattling it against the wall" and waking the other three children in the room. Petitioner also argued that it would have been impossible for him to reach over the top rail of the upper bunk bed, lift D.J. over the rail, and lower her to the bottom bunk for the purpose of performing oral sex.

Thereafter, the court gave the jury the verdict form on which Counts One and Two, charging sexual assault, were identical except for the count number, i.e., "One" or "Two." Likewise Counts Three through Nineteen, charging abuse by a parent, guardian, or custodian, were all identically worded except for the count number.

About an hour and a half into their deliberations, the jury asked, "Is there any way we can get a list of exactly what all of the charges are?" The circuit court replied:

> [W]hat I'm going to need you to do, to the best of your recollection, is recall the entirety of the jury charge that I read to you. I know it was long, and I know that there were a lot of counts, but you just keep plowing on through. Obviously, to the extent that you have any further difficulty or any questions that you need to pose, you just do what you did[.]

Five and a half hours into their deliberations, the jury indicated they did not have a unanimous verdict. In response, the circuit court issued an *Allen* charge.[3] Four hours later, the jury found petitioner guilty on Count One, which alleged first-degree sexual abuse; and Counts Seventeen, Eighteen, and Nineteen, which alleged sexual abuse by a parent, guardian, or custodian.

By order entered October 12, 2018, the circuit court sentenced petitioner to five to twenty-five years in prison on Count One; ten to twenty years in prison on Count Seventeen; ten to twenty years in prison on Count Eighteen; and ten to twenty years in prison on Count Nineteen. The sentences were ordered to be served consecutively. The circuit court also ordered that petitioner be placed on fifty years of supervised release upon his release.

Petitioner now appeals.

> "In reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review."

*State v. Sites*, 241 W. Va. 430, 437, 825 S.E.2d 758, 765 (2019) (citing Syl. Pt. 3, *State v. Vance*, 207 W. Va. 640, 535 S.E.2d 484 (2000)).

In his first assignment of error, petitioner argues that the circuit court erred in failing to recuse herself in petitioner's criminal case, because she had previously presided over petitioner's related child abuse and neglect case and, therefore, her impartiality might reasonably be questioned. In support of this argument, petitioner notes that Indiana Code § 31-32-8-2 provides that a judge who presides over a defendant's trial for rape, child molestation, sexual misconduct with a minor, and/or incest may not preside over that same defendant's parental termination case. *See In the Matter of the Termination of the Parent-Child Relationship of E.P. III*, 20 N.E.3d 915 (Ind. App. 2014). Petitioner also highlights that in an Arkansas case, *Ferguson v. State*, 498 S.W.3d

---

[3] *See Allen v. U.S.*, 164 U.S. 492 (1896). "An *Allen* charge is a 'supplemental instruction given to encourage deadlocked juries to reach an agreement.' F. Cleckley, 2 *Handbook on West Virginia Criminal Procedure*, at 257 (1993)." *State v. Shabazz*, 206 W. Va. 555, 559, 526 S.E.2d 521, 525 (1999).

733 (Ark. 2016), the Arkansas Supreme Court precluded a trial court judge from presiding over both a litigant's "dependency-neglect" case and subsequent criminal case arising from the same facts. The Arkansas court based its ruling on Rule 2.11 of Arkansas's Code of Judicial Conduct, which is identical to Rule 2.11 of the West Virginia Code of Judicial Conduct. Both Arkansas's and West Virginia's Rule 2.11 provide that "[a] judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned[.]"

Petitioner cites to no West Virginia law in support of his claim that the circuit court was prohibited from presiding over both petitioner's abuse and neglect and criminal cases. In fact, in West Virginia, circuit court judges routinely preside over both types of cases for a single litigant, particularly in single-judge circuits. As for Indiana's statute precluding a judge from ruling over both types of cases involving the same litigant, West Virginia has no such statute. Further, although Rule 2.11 of the West Virginia Code of Judicial Conduct is identical to Rule 2.11 of Arkansas's Code of Judicial Conduct, we have never interpreted our Rule 2.11 as automatically proscribing a circuit court from presiding over both a litigant's abuse and neglect case and his or her criminal case arising from the same facts. Nor have we found that a judge's knowledge of the facts in related cases is a bar to a judge presiding over related cases. That judges frequently preside over cases with related facts or related litigants is a common practice and necessary for judicial efficiency, not only in abuse and neglect and criminal cases, but in civil disputes as well. Therefore, we do not find that the circuit court judge erred in failing to recuse herself in petitioner's criminal case, merely because she previously presided over petitioner's related child abuse and neglect case.

Petitioner lodges similar complaints regarding other aspects of his case. First, petitioner claims the circuit court judge was somehow biased because she twice spoke with the child victim in camera during petitioner's and his wife's abuse and neglect case. During those in camera interviews, the judge said to the child victim: "I want you to feel like you can trust me[.]" "I'm being honest with you because you're being abundantly honest with me[.]" "You promise me you won't worry? Don't worry. Everything will be all right." "Yeah, you did great." Petitioner admits that these statements were appropriate in the abuse and neglect context, but claims they were inappropriate for a presiding judge in a criminal trial. We agree with petitioner that the statements were appropriate in a child and neglect proceeding. Children in such cases are often frightened and overwhelmed. Moreover, they are being asked to discuss traumatic events. That a circuit court creates a rapport with, or comforts, a child during an in camera interview in an abuse and neglect case is not per se inappropriate. Further, we note that the circuit court made the statements before it was assigned to petitioner's criminal case. Thus, we do not find that the court's statements to the child were evidence of any bias on the part of the circuit court against petitioner.

Petitioner next claims that in his criminal case, the circuit court judge referred to the evidence from the abuse and neglect proceeding that appeared to show the judge was biased against him. Petitioner also highlights that in rejecting his first proposed plea agreement the court said, "I know there's enough evidence for [the State] to get him on all counts." "The abuse and neglect lawyers already presented the entire criminal case." "[The State] could have indicted [petitioner] on a lot more." Regarding any proposed plea agreement, the court said, "[b]ased on what he did I won't accept anything less than three counts." Petitioner alleges that this last statement violates Rule 11(e)(1)(D) of the West Virginia Rules of Criminal Procedure, which provides, in relevant part, that "[t]he court shall not participate in any [plea agreement] discussions." We note that in

8

the circuit court's response to petitioner's motion to recuse, the court said it would not accept the first plea to a single count *because the parties had not yet reviewed the evidence from the CAC interviews* and therefore, were not fully apprised of petitioner's wrongful acts.

Petitioner presents no evidence to suggest that the circuit court participated in negotiating any plea agreement between the State and petitioner. Instead, he merely points to the circuit court's comments in rejecting his first proposed plea agreement. The "'West Virginia Rules of Criminal Procedure, Rule 11, gives a trial court discretion to refuse a plea bargain.' Syllabus Point 5, *State v. Guthrie*, 173 W.Va. 290, 315 S.E.2d 397 (1984)." Syl. Pt. 2, *Myers v. Frazier*, 173 W. Va. 658, 319 S.E.2d 782 (1984). "A court's ultimate discretion in accepting or rejecting a plea agreement is whether it is consistent with the public interest in the fair administration of justice." *Id.* at 661, 319 S.E.2d at 786, syl. pt. 4.

> A primary test to determine whether a plea bargain should be accepted or rejected is in light of the entire criminal event and given the defendant's prior criminal record whether the plea bargain enables the court to dispose of the case in a manner commensurate with the seriousness of the criminal charges and the character and background of the defendant.

*Id.* at 662, 319 S.E.2d at 786, syl. pt. 6.

In light of *Myers*, the circuit court's rejection of petitioner's plea agreements was not improper. The circuit court examined the relevant information in considering petitioner's proposed pleas and rejected them, as was the court's right. As for the court's comment that it would not accept a plea charging less than three counts, the circuit court later admitted that it may have been "a bit too frank" in making that statement. We agree and find that the court's statement was inartful; however, we cannot say that making that statement alone was the equivalent of participating in the plea negotiations. Instead, the judge was merely explaining her rationale for rejecting the plea agreement. We also note that in the judge's response to petitioner's motion to recuse, she noted the significant evidence against petitioner, i.e., that he was indicted on nineteen counts and that it was not in the interests of justice for petitioner to plead to fewer than three counts or to be eligible for parole in fifteen years given the nature of his criminal conduct. In light of these facts and the foregoing law, we find no error.

Petitioner's second assignment of error is that he was denied full and fair consideration of the charges against him when seventeen of the nineteen counts in the verdict form were identical to each other. We first note that, at trial, petitioner's counsel said that the verdict form was "agreed" and lodged no objection to it. Thus, this assignment of error must be reviewed for plain error. "To trigger application of the 'plain error' doctrine, there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings." Syl. Pt. 7, *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995).

The circuit court read the jury instructions to the jury. In those instructions, the court clearly stated the crimes charged and the prohibited acts allegedly performed by petitioner upon the victim. The jury was given the verdict form and, soon after, began their deliberations. Thereafter, the jury asked, "Is there any way we can get a list of exactly what all of the charges are?" As noted

above, the circuit court replied:

> [W]hat I'm going to need you to do, to the best of your recollection, is recall the entirety of the jury charge that I read to you. I know it was long, and I know that there were a lot of counts, but you just keep plowing on through. Obviously, to the extent that you have any further difficulty or *any questions that you need to pose, you just do what you did*. . . .

(Emphasis added.)

The circuit court did not err in opting not to give the jury a copy of the instructions. First and foremost, "[u]nder Rule 30 [of the West Virginia Rules of Criminal Procedure"], as amended, it was in the discretion of the judge to send the jury a written copy of the charge." *State v. Lutz*, 183 W. Va. 234, 235, 395 S.E.2d 478, 479 (1988). Second, after asking the jury to try to recall the charge to the best of its recollection, the court said that if the jury had "further difficulty or any questions," they could again bring those difficulties or questions to the court's attention. Having heard that instruction, the jury retired and did not ask the court for further instructions. Third, petitioner's counsel did not ask the court to reread the instructions to the jury. Accordingly, we reject petitioner's "plain error" claim because he fails to show that any error affected his substantial rights or the fairness, integrity, or public reputation of his judicial proceedings.

In petitioner's third and final assignment of error, he argues that the circuit court erred in denying his proposed jury instruction regarding the State's alleged failure to collect and preserve D.J.'s bedding. Petitioner highlights that on April 7, 2016, the police went to his home, obtained a consent to search from petitioner's wife, and inspected and took photographs of the bedroom that D.J. shared with her three sisters. However, the police did not collect the bedding in the room.

We review petitioner's claim under the following standard:

> When called upon to review a trial court's rejection or acceptance of a specific jury instruction, this Court generally applies an abuse of discretion standard . . . . Our review of the legal correctness of a jury instruction, however, is performed de novo, and when a jury instruction is rejected because of insufficient evidence, our review is plenary.

*State v. McGuire*, 200 W. Va. 823, 828, 490 S.E.2d 912, 917 (1997).

Petitioner proposed the following jury instruction with regard to the bedding:

> You've heard evidence that the State failed to collect or preserve the mattress and bed sheets of [D.J.] for the purpose of scientific testing.

> If you find that the State lost, destroyed, or failed to preserve evidence whose contents or quality are material to the issues in this case, you may infer that the true fact is against the State's interest, which in itself may create a reasonable doubt as to the defendant's guilt.

Petitioner claimed the instruction was proper based upon Syllabus Point 2 of *State v. Osakalumi*, 194 W. Va. 758, 461 S.E.2d 504 (1995), which provides:

> When the State had or should have had evidence requested by a criminal defendant but the evidence no longer exists when the defendant seeks its production, a trial court must determine (1) whether the requested material, if in the possession of the State at the time of the defendant's request for it, would have been subject to disclosure under either *West Virginia Rule of Criminal Procedure* 16 or case law; (2) whether the State had a duty to preserve the material; and (3) if the State did have a duty to preserve the material, whether the duty was breached and what consequences should flow from the breach. In determining what consequences should flow from the State's breach of its duty to preserve evidence, a trial court should consider (1) the degree of negligence or bad faith involved; (2) the importance of the missing evidence considering the probative value and reliability of secondary or substitute evidence that remains available; and (3) the sufficiency of the other evidence produced at the trial to sustain the conviction.

The circuit court rejected the instruction stating that this case did not regard "a situation where the State had possession of something and exhibited bad faith or negligence in failing to preserve it."

With regard to petitioner's argument that the police should have seized D.J.s bedding, *Arizona v. Youngblood*, 488 U.S. 51 (1988), is instructive. In *Youngblood*, the United States Supreme Court found that "the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Id.* at 57. The *Youngblood* Court further found that "imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution" was unsuitable, and held that a showing of bad faith on behalf of the police was required. *Id.* at 58.

In *Osakalumi*, we found that *Youngblood's* "bad faith on the part of the police" requirement to be "too narrow in that it restricts due process violations only to cases where a defendant can show bad faith, even where evidence, negligently lost or destroyed, might fatally prejudice a defendant." 194 W. Va. at 763-65, 461 S.E.2d at 509-11. Instead, we found that "[a]s a matter of state constitutional law . . . fundamental fairness requires this Court to evaluate the State's failure to preserve potentially exculpatory evidence in the context of the entire record." *Id.* at 766, 461 S.E.2d at 512 (citations omitted). Having done so in the instant case, we find that petitioner's argument fails. Here, the police were not duty bound to seize D.J.'s bedding. Further, although *Osakalumi* requires the State to preserve potentially exculpatory evidence, petitioner presents no valid evidence that anything found on the bedding would be exculpatory. To the contrary, he argues that his DNA would not have been found on D.J.'s bedding. Accordingly, such evidence would not be exculpatory evidence, i.e., "evidence which if made available would tend to exculpate an accused by creating a reasonable doubt as to his guilt" because the absence of evidence in this case was not proof of petitioner's innocence. Syl. Pt. 4, in part, *State v. Hatfield*, 169 W. Va. 191, 286 S.E.2d 402 (1982).

11

As for the *Osakalumi* test itself, the first factor is whether the items would have been subject to disclosure. 194 W. Va. 759, 461 S.E.2d 505, syl. pt. 2. Here, because the police did not seize the bedding, they could not have disclosed it. *Osakalumi's* second factor is whether the State had a duty to preserve the material. *Id.* Again, the police had no duty to preserve what they did not have. *Osakalumi's* third factor is multifaceted, that is, "if the State did have a duty to preserve the material, whether the duty was breached and what consequences should flow from the breach." *Id.* Petitioner fails to cite to any law that required the police to preserve the bedding. As for "(1) the degree of negligence or bad faith involved, (2) the importance of the missing evidence considering the probative value and reliability of secondary or substitute evidence that remains available, and (3) the sufficiency of the other evidence produced at the trial to sustain the conviction," we find that any negligence was minimal, and petitioner presented no evidence of bad faith. *Id.* We also find that even if the bedding had been seized and tested, the best petitioner could have hoped for was that his DNA was not found on the bedding. That alone would not have disproved the victim's claim, given that the other evidence produced at the trial was clearly sufficient to convict petitioner. Accordingly, in the context of the entire record, we find that the circuit court did not abuse its discretion in denying petitioner's proposed jury instruction.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** April 20, 2020

**CONCURRED IN BY:**

Chief Justice Tim Armstead
Justice Margaret L. Workman
Justice Elizabeth D. Walker
Justice Evan H. Jenkins
Justice John A. Hutchison