**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

**FILED**

**June 23, 2021**

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**State of West Virginia,**
**Plaintiff Below, Respondent**

**vs.)  No. 20-0208** (Kanawha County 18-F-568)

**Juan Xavier Chic,**
**Defendant Below, Petitioner**

## MEMORANDUM DECISION

Petitioner Juan Xavier Chic, by counsel Joseph A. Curia III, appeals the Circuit Court of Kanawha County's February 7, 2020, order sentencing him to concurrent terms of incarceration of life without mercy for his first-degree murder conviction, ten years for his use or presentment of a firearm during the commission of a felony conviction, and three years for his prohibited person in possession of a concealed firearm conviction. Respondent State of West Virginia, by counsel Lara K. Bissett, filed a response. Petitioner filed a reply.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

Andre Leonard was gunned down in his uncle's driveway on August 15, 2018. In the days following Mr. Leonard's murder, petitioner's girlfriend, Breanna Hall, gave three statements to the police. In the first two, both given on August 16, 2018, Ms. Hall stated that petitioner drove her to meet Mr. Leonard, who was the father of her children, at Mr. Leonard's uncle's home to pick up money from Mr. Leonard to purchase back-to-school clothes for their children. She said that when she and petitioner arrived, another vehicle was parked at the home, so petitioner backed the silver Chrysler he was driving into the driveway, and she exited the vehicle to approach Mr. Leonard. She stated that Mr. Leonard spoke to the occupant of the other vehicle before walking toward her. As she and Mr. Leonard got closer to one another, gunshots rang out, which she believed came from behind the home. She told police that petitioner grabbed Ms. Hall, threw her into the car, and drove away. Ms. Hall indicated that their vehicle was struck by bullets, and because they did not know whether they were also targets, they parked the car behind a nearby restaurant out of plain view. Throughout her statements, Ms. Hall maintained that she did not know who shot Mr. Leonard.

1

As detailed in a criminal complaint, during these initial interviews, Ms. Hall "became agitated and aggressively spr[u]ng up into [an interviewing officer's] face, t[ook] an aggressive stance and thereafter ma[de] physical contact with [the interviewing officer]." She was, accordingly, arrested for obstructing an officer. In a search that followed that arrest, officers discovered a controlled substance, so she was also charged with possession of a controlled substance. The officer further detailed that Ms. Hall had "a loaded .38 caliber S&W revolver" in her purse, which she had acknowledged owning in her interview. Ms. Hall eventually pled guilty to the obstructing charge and was sentenced to time served, which amounted to eleven days. In exchange for that guilty plea, the State dismissed her possession charge.

On August 26, 2018, following her release from jail, Ms. Hall gave a third statement to the police, implicating petitioner in Mr. Leonard's murder. Ms. Hall's account of the events leading up to her and petitioner's arrival at Mr. Leonard's uncle's house did not change. But, at the point she and Mr. Leonard were walking toward one another at Mr. Leonard's uncle's house, Ms. Hall stated that petitioner

> hops out of the car . . . [a]nd he had like some type of blue—it looked like a sheet or something in like one hand. I don't know what—I mean, from the sheet it looked like a gun. Okay? Like, under it. I could tell by like the figure.

She claimed that petitioner then started firing and that she "ducked down to the ground . . . and kinda like crawled to the passenger side of the door." She said petitioner yelled at her to get in the car, and he then drove off. As they were driving away, Ms. Hall said she heard two gunshots, which sounded like they hit the car. She stated petitioner "rolled the window down and it seemed like he mighta shot backwards." Petitioner reportedly threatened to kill Ms. Hall and her family if she told anyone about the shooting.

Torrion Betts, who was identified as the other individual present in the driveway at Mr. Leonard's uncle's home, gave a statement to the police on August 16, 2018. Mr. Betts explained that he drove his brother's white Nissan to Mr. Leonard's uncle's home on August 15, 2018, so that Mr. Leonard could repay money Mr. Betts had previously loaned him. Mr. Betts recalled that, while at Mr. Leonard's uncle's house, another vehicle backed into the driveway. Mr. Betts described the car and the driver, but he did not know petitioner or identify him by name. Mr. Betts stated that Mr. Leonard walked from his car toward Ms. Hall. Mr. Betts said, "the next thing you know I hear three shots," and he claimed he "automatically looked in the rearview mirror and turned around." He said he saw Mr. Leonard fall to the ground, stating, "I seen him shoot [Mr. Leonard] one more time." Mr. Betts said that the shooter "[t]hen looked at me and by that time I'm looking at him face to face and he just POP! POP! POP! POP! He just finished a whole clip on me so the first thing I did was got down then I sped off." Mr. Betts did not believe that Mr. Leonard was able to fire any shots. "I think it caught him by surprise," Mr. Betts surmised. Mr. Betts described the shooter's gun as being two-toned, chrome with a black bottom. Mr. Betts was not shot, but the car he was driving was.

Mr. Betts's brother and owner of the car Mr. Betts drove to Mr. Leonard's also gave a statement to the police and allowed them to search his vehicle. Mr. Betts's brother informed police

that Mr. Betts owned a 9 millimeter Springfield pistol but stated that "at the time [of Mr. Leonard's murder] it was at the house."

On November 16, 2018, petitioner was indicted on one count of first-degree murder, one count of the use or presentment of a firearm during the commission of a felony, and one count of being a prohibited person in possession of a concealed firearm. All three charges stemmed from the shooting death of Mr. Leonard.

Petitioner moved to dismiss his first-degree murder charge and use of a firearm during the commission of a felony charge. Petitioner asserted that the investigating officers did not attempt to locate, test, or preserve Mr. Betts's pistol. And, after interviewing Ms. Hall, officers seized her two cell phones. One, an iPhone, was returned after it was reportedly "unable to be accessed." Petitioner argued that the State had an obligation under Rule 16(a)(1)(C) of the West Virginia Rules of Criminal Procedure to produce the requested discovery, and that he specifically requested "any information related to Mr. Torrion Betts' firearm[,] . . . including any results of tests or examinations, all results of scientific tests or physical examinations performed, documents and tangible objects material to the preparation of his defense, and the contents of all cellphones seized in this matter." Petitioner also argued that the State had a duty to preserve the evidence under *State v. Osakalumi*, 194 W. Va. 758, 461 S.E.2d 504 (1995). Petitioner argued that, because the State had failed to produce the requested discovery and had failed to preserve the evidence, he was unable to inspect the gun and phone to obtain potentially exculpatory evidence, and dismissal of his first-degree murder charge and use of a firearm during the commission of a felony charge was warranted. Alternatively, petitioner argued that he was entitled to an adverse inference jury instruction.

Petitioner's motion was apparently denied, and he proceeded to trial on all three counts on December 2, 2019.[1] Sergeant Brian Hammontree of the West Virginia State Police ("WVSP") testified that he responded to the scene of Mr. Leonard's murder after receiving a report that shots had been fired. Sgt. Hammontree found Mr. Leonard face down in a pool of his own blood with some cash, a .40-caliber Glock gun, and a small baggie believed to contain cannabis. Sgt. Hammontree recovered six .40 caliber shell casings and four .357 Sig shell casings from the scene, and the WVSP secured the vehicles driven by Mr. Betts and petitioner. Sgt. Hammontree testified that Mr. Leonard was shot six times; that the vehicle driven by Mr. Betts was struck five times; that a neighbor's garage door was struck at least once; and that the vehicle driven by petitioner was struck twice.

Ms. Hall testified. Generally, her testimony was consistent with her third statement to the police. Ms. Hall also testified that she was unaware petitioner had a gun with him when they went to Mr. Leonard's uncle's home and that she and petitioner did not talk about anything specific after pulling into the driveway and waiting for Mr. Leonard to finish talking to Mr. Betts.

Ms. Hall was questioned about her initial statements to the police. She attributed her initial dishonesty to a "fear[] of retaliation or what somebody could have done to me if I would have said

---

[1] The circuit court's order on petitioner's motion to dismiss was not made part of the appendix record. Only that evidence relevant to petitioner's assignments of error is recounted here.

something immediately." Ms. Hall was also questioned regarding calls she made while incarcerated following her first two statements to the police. Portions of recordings of those calls were played for the jury. In one call Ms. Hall made to a friend, Ms. Hall told her friend that she "didn't do this. . . . And [petitioner] didn't do this either." In another call between Ms. Hall and her sister, Ms. Hall's sister informed Ms. Hall,

> I don't care what you think you're doing or what you—how you feel about him [petitioner] or whatever, really, he is going down regardless. He's not getting out. He's going to get this, this is going to happen, he's going to get convicted of this. It's just—it's not looking good for him. You have to do what you have to do for you and those girls. Do not do anything or say anything that will get anything brought on you because you don't want to say something about him. That's all I'm saying.

> . . . .

> So, if anybody comes to you in the future—and I'm telling you, you're not done, you're not off the hook. They will come to you because you are basically in this situation considered an eyewitness. You need to say whatever you have to say because at the end of the day you didn't do anything, and that's all that matters. . . .

> . . . .

> . . . [Y]ou need to do what you have to do. You know what you have to do. I want you to get out of this little mentality that you're in right now. Okay?

Ms. Hall denied that this conversation caused her to change her statement to the police, claiming she "changed [her] statement because that's what was right." She confirmed that the timing of her third statement—the one incriminating petitioner—coincided with her release from jail.

Mr. Betts also testified, and his testimony matched his statement to the police. While Mr. Betts could not specifically identify Mr. Leonard's murderer, Mr. Betts testified that the driver of the silver Chrysler present at Mr. Leonard's home was the shooter. Mr. Betts confirmed that he was unable to identify the shooter during two photo lineups shown to him by the police because he "didn't get a good look" at the shooter. Unlike Ms. Hall, Mr. Betts testified that nothing was covering the shooter's gun. Mr. Betts also testified to owning a 5.56 caliber gun but stated that he did not have it with him on the day of Mr. Leonard's murder. He stated that the police did not look at, test, or seize his gun.

Philip Cochran, a firearm and toolmark examiner at the West Virginia State Police Forensic Laboratory ("Crime Lab"), testified that the six recovered .40 caliber cartridge cases were fired from the Glock pistol found beside Mr. Leonard and that the four recovered .357 Sig fired cartridge cases were fired from an unknown firearm. Mr. Cochran testified that a .357 Sig is of the .38 caliber family, but "[b]ased on [his] examinations, the .357 Sig fired cases . . . were not fired in [Ms. Hall's] Smith & Wesson .38 Special revolver."

4

Mr. Cochran also examined the silver Chrysler driven by petitioner and the white Nissan driven by Mr. Betts. Mr. Cochran was able to determine that one bullet recovered from the white Nissan and another recovered on the road at the scene were not fired from the .40 caliber gun found by Mr. Leonard but, instead, from a gun within the .38 caliber family.

Koren Powers, the section supervisor of the trace evidence section at the Crime Lab, testified to gunshot residue analyses she conducted. Ms. Powers collected four samples from both the white Nissan and silver Chrysler. Of the samples collected, Ms. Powers found gunshot residue on only the driver's door interior of the silver Chrysler, the car driven by petitioner. Ms. Powers also took a sample from Ms. Hall on August 16, 2018. She did not "identify any particles of primary gunshot residue" on the sample taken from Ms. Hall.

The State rested after Ms. Powers's testimony. Petitioner moved for judgment of acquittal as to the first-degree murder charge, arguing that the State failed to present any evidence of premeditation. The State responded that there was evidence that petitioner traveled to Mr. Leonard's location, petitioner "decided to get out of the vehicle, he decided to walk over to where the crime happened, he decided to pull out a gun and he decided to start shooting and he decided to shoot several times." The State argued that this series of decisions leading "to the point of the actual murder" was sufficient evidence of premeditation to get the case before the jury. The circuit court denied petitioner's motion.

Two of Mr. Leonard's uncle's neighbors testified during petitioner's case-in-chief. One neighbor testified that he called 9-1-1 after hearing approximately six shots fired. The neighbor looked out his door and saw "a blurred white car go by . . . real fast." The neighbor then stepped outside his home and saw "a guy laying in the driveway up the street." He saw no other individuals or cars. The second neighbor also looked out her window after hearing shots fired and saw "[a] white car, like a four-door car, driving by my front past my house." She observed Mr. Leonard lying on the driveway but saw no other cars or individuals.

Corporal Steven W. Perdue of the WVSP testified that he interviewed Mr. Betts and presented him with the photo array. Corporal Perdue did not conduct a gunshot residue test on Mr. Betts or his clothing, nor did he seek to ascertain Mr. Betts's actions in the period between Mr. Leonard's murder and Mr. Betts's statement to the police.

At the conclusion of trial, the jury found petitioner guilty of each count charged in the indictment. The jury did not add a recommendation of mercy for petitioner's first-degree murder conviction.

Petitioner moved to set aside the verdict, for judgment of acquittal, or, alternatively, for a new trial. Of relevance to this appeal, petitioner argued that his counsel rendered ineffective assistance in failing to move for bifurcation of the mercy issue; that the first-degree murder conviction was contrary to the weight of the evidence presented because there was little, if any, evidence of premeditation; that his counsel failed to properly cross-examine Ms. Hall concerning her ongoing relationship with petitioner, which would have shown that Ms. Hall was not fearful

of him; and that the circuit court erred in denying petitioner's motion to dismiss the first-degree murder charge and use or presentment of a firearm during the commission of a felony charge.

The parties appeared for a hearing on petitioner's post-trial motions and sentencing. The court denied petitioner's post-trial motion on all grounds. It then sentenced petitioner to concurrent terms of incarceration of life without mercy for his first-degree murder conviction, ten years for his use or presentment of a firearm during the commission of a felony conviction, and three years for his being a prohibited person in possession of a concealed firearm conviction. Petitioner's sentences were memorialized in the court's February 7, 2020, order, and it is from this order that petitioner appeals.

In petitioner's first assignment of error, he argues that the circuit court erred in failing to dismiss his first-degree murder charge and use of a firearm during the commission of a felony charge. Petitioner argues that the State should have had evidence related to Mr. Betts's firearm, including test results, as well as the contents of Mr. Hall's iPhone that was returned to her. Petitioner maintains that this evidence would have been subject to disclosure under Rule 16 of the West Virginia Rules of Criminal Procedure and that the State had a duty to preserve it. Petitioner argues that the State was aware that Mr. Betts, who was present at the shooting, owned a gun, yet it did not attempt to recover that gun. Concerning Ms. Hall's iPhone, petitioner argues that "[t]here could have been texts, voicemails, phone records, and location data going directly to [Ms. Hall's] credibility . . . and the underlying issues in this matter." In support of his argument, petitioner cites Syllabus Point 2 of *Osakalumi* where we held that

> [w]hen the State had or should have had evidence requested by a criminal defendant but the evidence no longer exists when the defendant seeks its production, a trial court must determine (1) whether the requested material, if in the possession of the State at the time of the defendant's request for it, would have been subject to disclosure under either West Virginia Rule of Criminal Procedure 16 or case law;[2] (2) whether the State had a duty to preserve the material; and (3) if the State did have a duty to preserve the material, whether the duty was breached and what consequences should flow from the breach. In determining what consequences should flow from the State's breach of its duty to preserve evidence, a trial court should consider (1) the degree of negligence or bad faith involved; (2) the importance of the missing evidence considering the probative value and reliability of secondary or substitute evidence that remains available; and (3) the sufficiency of the other evidence produced at the trial to sustain the conviction.

194 W. Va. at 759, 461 S.E.2d at 505, Syl. Pt. 2 (footnote added). Petitioner's requests for the gun and related tests and Ms. Hall's iPhone were predicated on Rule 16 of the West Virginia Rules of Criminal Procedure, governing discovery and inspection, which provides, in relevant part, that

---

[2] Petitioner does not claim that the evidence should have been disclosed under case law such as *Brady v. Maryland*, 373 U.S. 83 (1963); *State v. Hatfield*, 169 W. Va. 191, 286 S.E.2d 402 (1982); or *State v. Youngblood*, 221 W. Va. 20, 650 S.E.2d 119 (2007). Rather, his motion was predicated on the State's failure to disclose under Rule 16 of the West Virginia Rules of Criminal Procedure.

[u]pon request of the defendant, the state shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, *which are within the possession, custody and control of the state*, and which are material to the preparation of the defense or are intended for use by the state as evidence in chief at the trial, or were obtained from or belong to the defendant.

W. Va. R. Crim. P. 16(a)(1)(C) (emphasis added).

We apply a de novo standard of review to a motion to dismiss an indictment. Syl. Pt. 1, in part, *State v. Carter*, 232 W. Va. 97, 750 S.E.2d 650 (2013) (citation omitted). "However, in addition to the *de novo* standard, where the circuit court conducts an evidentiary hearing upon the motion, this Court's 'clearly erroneous' standard of review is invoked concerning the circuit court's findings of fact." *Id.*, in part (citation omitted).

It is undisputed that Mr. Betts's gun was not in the possession, custody, or control of the State; therefore, petitioner has not demonstrated that he was entitled to dismissal of his first-degree murder charge and use of a firearm during the commission of a felony charge, insofar as that motion was predicated on Rule 16. *See* Syl. Pt. 7, *State v. Murray*, 180 W. Va. 41, 374 S.E.2d 405 (1988) ("Rule 16(a)(1)(C) of the West Virginia Rules of Criminal Procedure limits a defendant's discovery of documents and tangible objects to those which are within the possession, custody, and control of the State."); *Youngblood*, 221 W. Va. at 26, 650 S.E.2d at 125 ("In criminal proceedings the State is obligated to turn over documents and other matters in its possession, custody or control, if requested by a defendant pursuant to Rule 16 of the West Virginia Rules of Criminal Procedure.").

We further find that petitioner's reliance on *Osakalumi* is misplaced to the extent that he argues that that case imposed a burden on the State to obtain and test Mr. Betts's gun. *Osakalumi* "addressed the loss or destruction of a specific piece of evidence" and announced "new law on how trial courts should handle instances where evidence is destroyed." *State v. Davis*, 232 W. Va. 398, 413, 752 S.E.2d 429, 444 (2013). In other words, the evidence at issue in *Osakalumi*—a couch—was once in the State's possession; however, when the couch began emitting a foul odor, the police disposed of it at a landfill. *Osakalumi*, 194 W. Va. at 760, 461 S.E.2d at 506. The couch had a bullet hole through it from which the trajectory of the bullet could have been discerned. This evidence was crucial to determining whether the deceased individual, who the defendant was on trial for murdering, had in fact died by a self-inflicted gunshot. *Id.* at 761-62, 461 S.E.2d at 507-08. Against this backdrop, we found that the State's failure to preserve the couch that was once in its possession deprived the defendant of due process, and we reversed his first-degree murder conviction and remanded the case for a new trial. *Id.* at 768, 461 S.E.2d at 514. Petitioner points to nothing in *Osakalumi* that imposes an affirmative duty on the State to obtain evidence or to preserve evidence it never had.

We have also found *Osakalumi* inapplicable where the defendant, in reliance on that precedent, moved to dismiss the indictment due to the State's having allowed the victim's family to "raze the remains of the burned mobile home [in which the victim died], leading to the spoliation

and destruction of evidence crucial to the defense of these charges." *Davis*, 232 W. Va. at 412, 752 S.E.2d at 443. In deeming *Osakalumi* inapplicable there, we noted that "the physical evidence from the scene was not the basis of the State's case"; rather, the State relied on eyewitness testimony, physical evidence from petitioner's clothing and person, the petitioner's inconsistent statements, the victim's toxicological and pathological evidence, and the petitioner's threats against the victim. *Davis*, 232 W. Va. at 413-14, 752 S.E.2d at 444-45. Here, too, the State did not rely on—or use in any way—Mr. Betts's gun at trial. Indeed, that gun, whether it was a 9 millimeter or 5.56 caliber gun, did not match the caliber of the guns from which shots were fired at the murder scene; the only evidence was that Mr. Betts did not have his gun at the scene; and Mr. Betts was never implicated as the shooter, not even before Ms. Hall accused petitioner of murdering Mr. Leonard. As a result, the State had no duty to obtain Mr. Betts's firearm in the first instance, and the circuit court committed no error in denying his motion to dismiss based upon the State's failure to obtain, test, and preserve that gun.

We likewise find no error in the circuit court's refusal to offer a jury instruction permitting the jury to infer that evidence collected from Mr. Betts's gun would have been unfavorable to the State had it collected the gun. In *State v. James K.*, No. 18-0990, 2020 WL 1911448 (W. Va. Apr. 2020)(memorandum decision), the defendant, who had been charged with various sex crimes, sought such an instruction where the State failed to collect his victim's bedding. *Id.* at \*9. Like petitioner, the defendant in *James K.* relied on *Osakalumi* in claiming that the circuit court was obligated to give the requested instruction. *James K.*, 2020 WL 1911448 at \*9. The *James K.* Court, applying the test set forth in *Osakalumi*, found no error in the circuit court's refusal to give the requested instruction because, first, the State "could not have disclosed" bedding it did not seize and, second, "the police had no duty to preserve what they did not have." *James K.*, 2020 WL 1911448 at \*10. Noting that "*Osakalumi*'s third factor is multifaceted" in that it requires consideration of whether the State had a duty to preserve the evidence, whether that duty was breached, and what consequences should flow from the breach, we noted that petitioner had failed "to cite to any law that required the police to preserve the bedding." *James K.*, 2020 WL 1911448 at \*10. Just as in *James K.*, the State could not have disclosed Mr. Betts's gun or any related evidence because it did not seize the gun, and the State had no duty to preserve something it never had. Because petitioner has not established that the State breached any duty to preserve evidence, the circuit court did not err in refusing to give an adverse inference jury instruction as it relates to Mr. Betts's gun.

We also find no error in the circuit court's denial of petitioner's motion to dismiss or, alternatively, for an adverse inference jury instruction as the motion related to Ms. Hall's iPhone. Petitioner fails to point to any authority requiring the State to preserve a phone from which no evidence could be obtained. Even assuming that there was such a duty and that the State breached that duty by returning the phone to Ms. Hall, petitioner has not demonstrated that either dismissal of the first-degree murder charge and use of a firearm during the commission of a felony charge or an adverse inference jury instruction is an appropriate consequence. In *State v. Medley*, No. 14-0729, 2015 WL 2364302 (W. Va. May 15, 2015)(memorandum decision), we considered the nearly identical assertion that the State violated our holding in *Osakalumi* for failing to preserve a cell phone that it had reviewed. *Medley*, 2015 WL 2364302 at \*5. In assuming that the phone would have been subject to disclosure and that the State had a duty to preserve it, we considered the consequences that should flow from that breach. *Id.* Noting that the evidence showed that

"there was nothing relevant on the phone," that "poor cell service limited [the victim's] use of the phone," that it was "never catalogued . . . as potential evidence," that it "was not introduced as evidence at trial," and that it "played no role in the State's case against" the defendant, we found no error in the State's failure to preserve the phone. *Id.* Here, too, nothing relevant was found on the phone as it could not be accessed, it was not introduced as evidence at trial, and it played no role in the State's case against petitioner. Accordingly, we find no error in the court's determination that neither dismissal of the requested charges nor an adverse inference jury instruction was warranted.

Next, petitioner argues that there was insufficient evidence to sustain the jury's verdicts on all three counts. In support, he makes a bulleted list of the following "observations and points": the murder weapon was never recovered; the gun used to kill Mr. Leonard was not conclusively identified;[3] Ms. Hall changed her statement after "being pressured by a family member to implicate" petitioner; Ms. Hall initially told investigators that she drove the silver Chrysler to Mr. Leonard's uncle's home;[4] Mr. Betts could not identify Mr. Leonard's shooter; Mr. Betts or his brother lied about the caliber of gun Mr. Betts owned; there was conflicting evidence about whether there was a covering over the gun; Ms. Hall's account of a blue shirt sleeve covering petitioner's gun conflicts with surveillance footage showing petitioner wearing a white tank top; and, although the physical evidence established that Mr. Leonard fired the gun found next to his body, neither Ms. Hall nor Mr. Betts testified about him firing a gun.

Petitioner also provides additional argument to support his claim that there was insufficient evidence to support his first-degree murder conviction, namely asserting that there was insufficient evidence of premeditation and deliberation. Petitioner argues that the record is "entirely devoid" of evidence that petitioner had a motive to kill Mr. Leonard, previously threatened him, or planned to kill him. Petitioner further argues that the fact that Mr. Leonard fired his gun suggests that petitioner's "conduct was reactionary in nature (as opposed to premediated)."

A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could

---

[3] Petitioner argues that while .357 Sig cartridges were found at the scene, there was no conclusive evidence that those cartridges killed Mr. Leonard.

[4] During her two initial statements to the police, Ms. Hall, in recounting the events leading to Mr. Leonard's murder, stated in general terms that "we've been driving" petitioner's mother's car because "[s]omething's wrong" with petitioner's car, that "we go down" to Mr. Leonard's uncle's house, and that "I pull up in front of his house." During these initial interviews, however, she also made clear, "I don't drive. . . . I don't have a license so I don't drive."

find guilt beyond a reasonable doubt.

Syl. Pt. 3, in part, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995).

With respect to petitioner's list of the conflicting or lacking evidence, we note that petitioner does not identify the elements of any of the crimes of which he was convicted or offer argument demonstrating that these conflicts or alleged gaps in the evidence amount to an insufficiency of the evidence as to any specific element of any crime of which he was convicted. Rule 10(c)(7) of this Court's Rules of Appellate Procedure requires a brief to contain "an argument exhibiting clearly the points of fact and law presented . . . and citing the authorities relied on." Further, as explained in an Administrative Order entered December 10, 2012, *Re: Filings That Do Not Comply With the Rules of Appellate Procedure*, briefs that "fail to structure an argument applying applicable law" are not compliant with this Court's rules. And where assignments of error are inadequately briefed, we will not address them. *See State v. Allen*, 208 W. Va. 144, 162, 539 S.E.2d 87, 105 (1999) ("In the absence of supporting authority, we decline further to review this alleged error because it has not been adequately briefed."). Nevertheless, we observe that petitioner primarily lists issues of witness credibility or evidentiary weight, which are issues reserved for a jury, not this Court. *Guthrie*, 194 W. Va. at 663, 461 S.E.2d at 169, Syl. Pt. 3, in part; *see also State v. LaRock*, 196 W. Va. 294, 304, 470 S.E.2d 613, 623 (1996) (requiring that "all evidentiary conflicts and credibility questions [be resolved] in the prosecution's favor").

Concerning petitioner's more particularized assertion that there was insufficient evidence of premeditation and deliberation to support his first-degree murder conviction, we have stated that "[w]here there has been an unlawful homicide by shooting and the State produces evidence that the homicide was a result of malice or a specific intent to kill and was deliberate and premeditated, this is sufficient to support a conviction for first[-]degree murder." Syl. Pt. 3, *State v. Hatfield*, 169 W. Va. 191, 286 S.E.2d 402 (1982).

> Although premeditation and deliberation are not measured by any particular period of time, there must be some period between the formation of the intent to kill and the actual killing, which indicates the killing is by prior calculation and design. This means there must be an opportunity for some reflection on the intention to kill after it is formed.

*Guthrie*, 194 W. Va. at 664, 461 S.E.2d at 170, Syl. Pt. 5.

> In addition, as a practical matter, premeditation generally can be proved only by circumstantial evidence. Because the defendant's mental processes are wholly subjective, it is seldom possible to prove them directly. If premeditation is found, it must ordinarily be inferred from the objective facts. Accordingly, if one voluntarily does an act, the direct and natural tendency of which is to destroy another's life, it fairly may be inferred, in the absence of evidence to the contrary, that the destruction of that other's life was intended.

*LaRock*, 196 W. Va. at 305, 470 S.E.2d at 624.

There was sufficient evidence to support petitioner's first-degree murder conviction. Petitioner armed himself to drive Ms. Hall to meet Mr. Leonard. After arriving at Mr. Leonard's uncle's house and upon seeing Mr. Leonard, petitioner exited his car and, according to Ms. Hall's eyewitness testimony, shot Mr. Leonard multiple times. Mr. Betts, too, testified that the driver of the silver Chrysler—the car petitioner drove—shot Mr. Leonard. Gunshot residue was, in fact, found on the driver's side of the silver Chrysler. Each successive shot petitioner voluntarily fired at Mr. Leonard had "the direct and natural tendency . . . to destroy [Mr. Leonard's] life"; therefore, there was sufficient evidence of premeditation and deliberation. *Id.*

In petitioner's third assignment of error, he claims that the State failed to show beyond a reasonable doubt that he did not act in self-defense. Petitioner's fourth assignment of error, which is related to and can be addressed with his third, concerns the court's failure to instruct the jury on self-defense. Petitioner acknowledges that he did not request a self-defense jury instruction, so he urges application of the plain error doctrine.

In support of these assignments of error, petitioner argues that it was undisputed that Mr. Leonard had a gun that he fired six times. Petitioner submits that this means petitioner "actually . . . believe[d] . . . that he [was] in imminent danger of death or serious bodily harm from which he could save himself only by using deadly force against his assailant." *State v. Hughes*, 197 W. Va. 518, 524, 476 S.E.2d 189, 195 (1996) (citation omitted). As a result, he claims, the prosecution needed to have proven beyond a reasonable doubt that he did not act in self-defense and the court needed to have instructed the jury on self-defense.

In Syllabus Point 4 of *State v. Kirtley*, 162 W. Va. 249, 252 S.E.2d 374 (1978), we held that "[o]nce there is sufficient evidence to create a reasonable doubt that the killing resulted from the defendant acting in self-defense, the prosecution must prove beyond a reasonable doubt that the defendant did not act in self-defense." Critically, the prosecution bears this burden "[o]*nce there is sufficient evidence* to create a reasonable doubt that the killing resulted from the defendant acting in self-defense." *Id.*, in part (emphasis added). Here, there was *no* evidence that petitioner acted in self-defense because his theory at trial was that he was not the shooter. Therefore, the State was under no obligation to prove beyond a reasonable doubt that petitioner did not act in self-defense. And, due to the absence of any evidence that petitioner acted in self-defense, a jury instruction on self-defense would have been improper. "Instructions must be based upon the evidence and an instruction which is not supported by evidence should not be given." Syl. Pt. 4, *State v. Collins*, 154 W. Va. 771, 180 S.E.2d 54 (1971).

In petitioner's final assignment of error, he argues that his trial counsel were ineffective because they failed to request a jury instruction on self-defense; failed to discuss issues of bifurcation and mercy with him; failed to move for bifurcation or argue for mercy; and failed to impeach Ms. Hall on crucial issues. Petitioner acknowledges that ineffective assistance of counsel claims are generally reserved for a petition for a writ of habeas corpus, but he contends that, under *State ex rel. Daniel v. Legursky*, 195 W. Va. 314, 465 S.E.2d 416 (1995), his claims can be addressed here because they were raised in his motion for a new trial.

In the portion of *Legursky* petitioner cites to support his assertion that his ineffective assistance of counsel claims should be addressed on direct appeal, we stated that "[t]raditionally,

ineffective assistance of counsel claims are not cognizable on direct appeal." *Id.* at 317 n.1, 465 S.E.2d at 419 n.1. "If the parties *have developed the record*, however, this Court can elect to hear the issue of ineffective assistance on direct appeal," and we instructed that the issue be brought in a "motion for new trial on 'other grounds.'" *Id.* (emphasis added). The record here, though, was not developed below. The circuit court declined to permit development of the issue because it did not "want to come back and have another issue in a habeas proceeding," and it instructed counsel to "move on." An undeveloped record makes it "difficult, if not impossible, for this Court to determine 'whether the attorney's performance below was ineffective or merely the result of trial strategy.'" *State v. Woodson*, 222 W. Va. 607, 621, 671 S.E.2d 438, 452 (2008) (citation omitted). Therefore, we have "cautioned that '[i]neffective assistance claims raised on direct appeal are presumptively subject to dismissal.'" *Id.* (Citation omitted.) Given the undeveloped record on these ineffective assistance of counsel claims, they will not be addressed in this direct appeal.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** June 23, 2021

**CONCURRED IN BY:**

Chief Justice Evan H. Jenkins
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice John A. Hutchison
Justice William R. Wooton